UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                     :

ALLISON C. WICKLAND,                       :

                             :

               Plaintiff,           :

         v.                        :           **COMPLAINT**

                             :

THE CITY OF NEW YORK; DARINKA MALDANADO,  :
NYPD POLICE OFFICERS JOHN AND JANE DOES # 1 and 2;  :
other employees and agents of the City of New York identified as  :
"JOHN DOES" AND "JANE DOES" No. 3-10; NEW YORK  :
CITY HEALTH AND HOSPITALS CORPORATION; DOCTOR  :
PAUL POULAKOS; DOCTOR HAGOP HAJAIN; DOCTOR  :
LEO LOPEZ; RACHAEL JOHNSTON RODRIGUEZ; DOCTOR  :
DANIEL KESTELMAN; DOCTOR DANIEL ECKROTH;  :
DOCTOR AMANY GALA; other employees and agents of  :
NYCHHC identified as "JOHN ROES" AND "JANE ROES" No.  :
1-10, all individual defendants being named in their individually  :
and in their official capacities,  :

                             :

               Defendants.        :

                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       Plaintiff, Allison C. Wickland, by the undersigned attorneys, hereby alleges as and for her

Complaint the following:

## INTRODUCTION

       1.  Plaintiff, Allison C. Wickland ("Wickland"), brings this action against the above-

referenced Defendants, jointly and severally, to vindicate her civil rights and to recover

compensatory and punitive damages against each of the Defendants.

       2.  In February of 2021 Wickland left her home in Brooklyn, where she was living

with her mother, and went to housing agency of the City of New York to find affordable housing

for herself.  She never should have gone to the City of New York for help.

3. After remaining in COVID quarantine for nine days at Manhattan Holiday Inn being run by the City of New York (the "City"), on February 25, 2021, City employees at the hotel became aggressive with Wickland about whether Wickland had complied with their testing requirements, and Wickland became concerned that they were going to forcibly administer unwanted medical tests on her.

4. Wickland called 911 to get assistance, and in retaliation, Defendant Darinka Maldanado, who was managing the hotel for the City, also called 911, falsely and maliciously claiming that Wickland was an emotionally disturbed person.

5. Wickland was not an emotionally disturbed person, was not suffering from any mental illness, and was not acting in a way that could reasonable be viewed as dangerous to herself or others. Nevertheless, the NYPD John and Jane Doe Officers who responded to the scene arrested Wickland on February 25, 2021 and arranged for the FDNY's EMT personnel to transport Wickland against her will under NYPD escort to the psychiatric emergency room at Bellevue Hospital as an emotionally disturbed person needing emergency attention.

6. At Bellevue Hospital, Wickland was falsely labeled as a "homeless" street person living in a "shelter" and was repeatedly diagnosed and re-diagnosed as a dangerous and a mentally ill schizophrenic by Defendants Doctors Paul Poulakos, Hagop Hajain, Leo Lopez, Rachael Johnston Rodriguez, Daniel Kestelman, Daniel Eckroth and Amany Gala, all of whom worked at Bellevue Hospital at the relevant times.

7. As a result of the false and groundless diagnosis, Wickland, who was a 56 year old woman at the time with no psychiatric history, was physically assaulted by large and aggressive men working at Bellevue, stripped of her clothing, placed in physical restraints, forcible injected by hypodermic needless with unwanted and needless psychiatric drugs on

numerous occasions, and held against her will without basis, justification or privilege for 15 days from February 25, 2021 through March 12, 2021, when a New York State Supreme Court Justice ordered her release because Bellevue failed to establish any basis for Wickland's involuntary commitment.

8.   As set forth in more detail below, Wickland sues the Defendants for damages in an amount to be established at trial for the loss of Wickland's liberty, for the violation of her right to due process, her right to speak or not to speak, her right to be free of assault and battery, her right to be free of unwanted and forced medical treatment and for the violations on her humanity and the degrading, humiliating and offensive treatment she received at the hands of the Defendants.

**PARTIES**

9.   Plaintiff Wickland is a black woman and a resident of the City of New York.

10.   Defendant, the City of New York (the "City") is a municipal corporation duly organized and existing under the laws of the State of New York.

11.  The City is a "person" for purposes of the enforcement of the rights guaranteed under 42 U. S. C. §§ 1981 & 1983.

12.  Defendant Darinka Maldanado was, as of February 25, 2021, upon information and belief, an employee or agent of the City working as the manager of a Holiday Inn hotel being operated and controlled by the City that is located at 538 West 48th Street, New York, New York.

13.   Defendants NYPD John or Jane Doe Officers # 1 & 2 were uniformed members of the New York City Police Department as of February 25, 2021, who unlawfully and falsely arrested and imprisoned Wickland on February 25, 2021 without probable cause to believe that

Wickland was either mentally ill or dangerous to herself or others.

14.   Defendants, John and Jane Does No. 3-10, are and were at the relevant time employees of City working at the New York City Police Department ("NYPD") or the New York City Fire Department (FDNY") as Police Officers or Emergency Medical Technicians ("EMTs").

15.   Defendant, The New York City Health and Hospitals Corporation ("NYCHHC"), is a New York public corporation organized and operating under the laws of the State and the City of New York.

16.   Defendants Doctors Paul Poulakos, Hagop Hajain, Leo Lopez, Rachael Johnston Rodriguez, Daniel Kestelman, Daniel Eckroth and Amany Gala  (hereinafter collectively the "Doctor Defendants") were employees or agents of NYCHHC working as physicians at Bellevue Hospital Center, 462 First Avenue, New York, New York 10016 ("Bellevue" or the "Hospital") during the period from February 25, 2021 through March 12, 2021.

17.   Defendants, John and Jane Roes No. 1-10, were at the time relevant to this action working at Bellevue in their capacities as security guards, nurses, doctors, or aides thereto (collectively, the "NYCHHC or the "John and Jane Roe Defendants"), who participated in the misconduct and mistreatment of Wickland from February 25, 2021 through March 12, 2021, as set forth in greater detail below.

## JURISDICTION AND VENUE

18.   Federal jurisdiction is based on 28 U. S. C. §§ 1331 and 1343(a)(3)-(4) for the federal claims, and supplemental jurisdiction over the New York common law claims is based on 28 U. S. C. § 1367(a) because those claims arise from a common nucleus of operative facts and are intertwined with the federal claims.

19.   Wickland has fully complied with all administrative prerequisites to filing this

suit by the filing of a Notice of Claim with the City of New York and with the NYCHHC within the time required by local law and has otherwise complied with all other prerequisites to suit.

20.  Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U. S. C. §§ 1391 (b) & (c).

## STATEMENT OF FACTS

21.  At the time of the events relevant to this Complaint, Wickland was 56 years old.

22.  Wickland has never been diagnosis with any kind of mental illness at any time in her life and has never sought or presented herself to any kind of mental health profession for treatment for any kind of mental illness.

23.  In February of 2021, Wickland decided to seek new housing and to move from her residence in Brooklyn, where she was living with her mother, to affordable housing in the City of New York.

24.  In order to find affordable housing for herself, Wickland sough assistance from a City housing agency commonly referred to as the Human Resources Agency.

25.  At that time and at all other times relevant to this Compliant, Wickland was medically and mentally healthy and was capable of, and was caring for, all of her personal needs without assistance or intervention by anyone.

26.  On about February 15, 2021 and because of the COVID pandemic, Wickland was offered temporary housing at a Holiday Inn hotel in mid-town Manhattan located at 538 West 48th Street, New York, New York.

27.  The hotel is located within the confines of the NYPD's Midtown North Precinct.

28.  The hotel was being operated and controlled by the City of New York and its employees and agents were running the hotel's operations.

29.  When Wickland checked into the hotel, hotel staff provided her with two options regarding protocols for the COVID pandemic:  Wickland could undergo certain undefined tests to determine whether she had COVID; or Wickland could remain in the hotel for about 11 days and during that 11-day period have her temperature and oxygen levels check every 24 hours with a thermometer gun and a finger-tip oxygen level indicator.

30.  Wickland opted for the second option because that option appeared to her to be less intrusive and invasive than the ill-defined COVID-test option.

31.  For the next nine days, Wickland complied with the COVID protocols.

32.  During their morning or evening rounds at the hotel, City employees dressed in yellow medical gowns measured and recorded Wickland's temperature and her oxygen levels, all of which were normal or within normal ranges.

33.  On the morning of February 25, 2021, two City employees came to Wickland's door and told her that it was time for them to check Wickland's temperature and oxygen levels, even though Wickland had already been cleared the night before.

34.  Rather than admit the two employees into her room, Wickland stepped out into the hallway and attempted to explain to them that she had already been cleared the night before.

35.  The two employees did not accept Wickland's statements and without permissible took her temperature with the hand gun and affixed the oxygen meter to one of Wickland's fingers.

36.  Although Wickland's temperature was normal, the oxygen meter did not work and the two employees persisted in insisting that Wickland remain outside her room and told Wickland she would have to remain for further unspecified and vague testing.

37.  The two City employees, in an increasingly aggressive manner, told Wickland

that she had no choice and suggested that some addition testing was going to be administered with or without her consent.

38.   As the discussion progressed in the hallway outside Wickland's room, other hotel staff and other hotel occupants began to gather around Wickland, and as the crowd gathered, Wickland began to feel more and more unsafe.

39.   As a result of her inability to resolve the situation and as a result of her increasing concerns for her safety, Wickland called 911 that morning, somewhere between about 8:30 am and 9:30 am, and told the 911 operator that she was feeling unsafe and wanted the police to respond to the situation.

40.   While Wickland waited for the police to respond, a large crowd, consisting of hotel staff and hotel guests, began gathering around the entrance to Wickland's room.

41.   The crowd grew so thick that Wickland was literally confined in the hallway and Wickland did not feel free to leave.

42.   About thirty minutes after the first 911 call, Wickland called 911 again to inquire about when the police would respond to the situation.

43.   At one point while the crowd was pressing into Wickland's space, Wickland believed that somebody may have entered her room without her permission and might be trying to take her property.

44.   After waiting what seemed to be an extended period of time for the police to respond, eventually two (and possibly three) EMTs from the FDNY appeared at the scene at about 11:00 AM and began to ask Wickland whether she needed any medical attention.

45.   Wickland did not at the time understand why medical or EMT personnel appeared at the hotel because she did not call for medical attention; instead, Wickland expected

the police to arrive in response to her calls to 911.

46. Wickland has now come to understand and believe that Defendant Darinka Maldanado called 911 to report Wickland as an "emotionally disturbed person" after and because Defendant Maldanado learned that Wickland had previously called 911.

47. Defendant Maldanado was acting jointly in concert with John and Jane Doe # 1 and 2 for the purpose of improperly causing the arrest of Wickland as an emotionally disturbed person.

48. Defendant Maldanado was acting jointly in concert with John and Jane Doe # 1 and 2 maliciously and vindictively against Wickland to punish Wickland for exercising her right to complain and to report her concerns for her safety at the hotel.

49. The EMTs who responded to the scene spoke to Wickland about the situation and after apparently evaluating her, one of the EMTs stated at the end of the interview that Wickland was fine and did not need further medical attention.

50. At about 11:30 AM that morning, however, two uniformed NYPD police officers, Defendants John and Jane Does # 1 & 2, arrived at the scene in front of Wickland's room.

51. One of the officers was a black male and the other officer was a white female.

52. Upon information and belief, the two officers, Defendants John and Jane Doe #1 & 2, came from the NYPD's Midtown North Precinct and arrived at the scene in response to the call from Defendant Darinka Maldanado, who claimed falsely that Wickland was acting like an emotionally disturbed person.

53. Without basis or any kind of reasonable investigation, Defendants John and Jane Doe #1 & 2 concluded that Wickland was dangerous to herself or others and that Wickland was behaving in a paranoid manner because she had previously expressed concern about one of the

members of the crowd trying to surreptitiously enter her room and take her property.

54.   Defendants John and Jane Doe #1 & 2, acting at the direction and request of Defendant Maldanado, arrested Wickland without probable cause to believed that Wickland was either mentally ill, dangerous or in need of emergency medical or psychiatric attention.

55.   Defendants John and Jane Doe # 1 & 2, acting at the direction and request of Defendant Maldanado, handcuffed Wickland, needlessly slammed her onto a gurney, and, after placing Wickland into an awaiting FDNY ambulance, escorted Wickland to Bellevue Hospital.

56.   Wickland was taken to Bellevue Hospital against her will and without excuse or justification based on the false designation of Wickland as a dangerous and emotionally disturbed person.

57.   Wickland had done absolutely nothing that would suggest to a reasonable person or a reasonable police officer that she was dangerous, mentally ill, or in need of emergency medical or psychiatric attention.

58. Defendants John and Jane Doe # 1 & 2 simply arrested Wickland as an "EDP" because that was the simplest way to end the incident and move on to their next assignment.

59.   Upon information and belief, the NYPD has a practice of resolving EDP calls emanating from the 911 system by placing the burden on the target of the 911 call to prove that the target is not dangerous or in need of emergency medical or psychiatric attention in violation of state law and a person's due process rights to liberty.

60.   At about noon on February 25, 2021, Wickland arrived at Bellevue Hospital.

61.   Upon information and Defendant Paul Poulakos, who is a Doctor of Osteopathy employed by Defendant NYCHHC, observed Wickland for a matter of a few minutes and falsely and recklessly diagnosed her as having a mental illness, being dangerous to herself, and in need

of emergency psychiatric attention.

62.   Defendant Poulakos did not conduct the necessary or appropriate evaluation of Wickland and only spent a few minutes observing Wickland, which was patently inadequate under good and accepted practices to conduct a psychiatric evaluation.

63.   Defendant Poulakos and thereafter the other Doctor Defendants incorrectly concluded without any basis that Wickland was homeless street person and that she had been brought to the hospital from a homeless shelter run by the City.

64.   The Holiday Inn hotel, which is depicted below, was not a homeless shelter:



65.   Based on their incorrect and baseless assumptions about Wickland, Defendant Poulakos and the other Doctor Defendants simply stop or never employed any kind of

independent, professional judgment about Wickland and simply assumed that she was a mentally ill, homeless, black, and impoverish street person woman.

66.  Defendant Poulakos signed an authorization under Section 9.39 of the New York Mental Hygiene Law to involuntarily admit Wickland without basis because he was unwilling to spend the time necessary to gain the trust and confidence of Wickland.

67.  Defendant Poulakos signed the authorization to involuntarily admit Wickland because he was unwilling and unable to obtain information about Wickland from Wickland and improperly imposed on Wickland the burden of proving that she was not mentally ill or dangerous, in violation of Wickland's right to due process, and in violation of her rights to remain silent and not to speak, all as guaranteed by the First, Fifth and Fourteenth Amendments to the United States Constitution.

68.  Without any basis, Defendant Amany Gala, an NYCHHC employee and doctor, merely relied on the conclusory and inadequate evaluation by Defendant Poulakos in further approving of Wickland's wrongful confinement.

69.  On February 25, 2021, both Defendants Poulakos and Gala approved of the continued involuntary admission and imprisonment of Wickland to the hospital on the grounds that Wickland was likely to be mentally ill, dangerous and in need of emergency medical or psychiatric attention.

70.  Wickland had done absolutely nothing at the hospital (or at the hotel) that would suggest to a reasonable person or a reasonable doctor that she was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention.

71.  Without any basis and in violation of Wickland's rights, on about February 25, 2021, Defendant Eckroth directed and authorized hospital staff to place Wickland in physical

restraints and ordered that Wickland be given sedatives against Wickland's will.

72.   On numerous occasions while Wickland was being held at the hospital, hospital staff, acting under the orders by the Doctor Defendants, placed Wickland in unnecessary and unduly restrictive restraints that caused her severe pain and bruising.

73.   Throughout her time at Bellevue Hospital, Wickland repeatedly told the Doctor Defendants and the Bellevue Hospital staff that she did not want any drugs or sedatives for any reason.

74.   On numerous occasions while Wickland was being held at the hospital, hospital staff, acting under the orders of the Doctor Defendants, forcible injected Wickland with sedatives that rendered Wickland unconscious for hours or for days.

75.   The forcible injections occurred about times while Wickland was being held at Bellevue.

76.   On the first such occasion, after Wickland was forcibly injected with a sedative, she woke up about two days later and discovered that her clothing had been removed form her body while she was unconscious and that somebody had dressed her in a hospital gown.

77.   At no time before any of the forced injections was Wickland creating an emergency situation, in that she was not causing or being imminently likely to cause physical harm to herself or others, as required by law.

78.   As a result of her treatment at the hospital, Wickland did not believe that the staff or doctors were acting in her best interests and avoided contact with them as much as possible.

79.  Two days later, on about February 27, 2021, Defendant Hajain approved of the continued involuntary admission and imprisonment of Wickland under Section 9.39 of the New

York Mental Hygiene Law on the ground that Wickland was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention.

80.  Wickland had done absolutely nothing at the hospital (or elsewhere) that would suggest to Defendant Hajain or a reasonable person or a reasonable doctor that she was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention, and no information had come to Defendant Hajain's attention that would have led a reasonable person or a reasonable doctor that Wickland was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention.

81.  Defendant Hajain approved of Wickland's continued involuntary admission because Defendant Hajain was unwilling to spend the time required to gain the trust and confidence of Wickland and because he improperly imposed on Wickland the burden of proving that she was not mentally ill or dangerous, in violation of Wickland's rights under the United States Constitution.

82.  About five days later, on about March 2, 2021, Defendant Lopez, as the Director of Inpatient Psychiatry, authorized under Section 9.27 of the New York Mental Hygiene Law the continued confinement of Wickland based on the certifications of such need by Defendants Kestelman and Rodriguez, who attested to the need for Wickland's continued involuntary admission and imprisonment of Wickland at Bellevue Hospital for 60 days.

83.  Wickland had done absolutely nothing at the hospital (or elsewhere) that would suggest to Defendant Lopez or Defendant Kestelman or Defendant Rodriguez or a reasonable person or a reasonable doctor that Wickland was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention, and no information had come to Defendant Lopez's or Defendant Kestelman's or Defendant  Rodriguez's attention that would have led a

reasonable person or a reasonable doctor that Wickland was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention.

84.  Defendant Kestelman or Defendant Rodriguez authorized Wickland's continued involuntary admission because they were unwilling to spend the time required to gain the trust and confidence of Wickland and because they improperly imposed on Wickland the burden of proving that she was not mentally ill or dangerous, in violation of her rights under the United States Constitution.

85.  Defendant Rodriguez falsely and recklessly and without basis diagnosed Wickland as suffering from schizophrenia, even though such a diagnosis required that the symptoms of schizophrenia be present for a significant portion of time during a one-month period before such a diagnosis could be given.

86. Defendant Rodriguez falsely and recklessly and without basis diagnosed Wickland as suffering from schizophrenia, even though she knew Wickland had no documented psychiatric history and even though Defendant Rodriguez knew or should have known that it is well know and established among psychiatrist that schizophrenia typically arises in young adults by their late twenties or thirties and that it is very rare to be first presented or diagnosed in a older person, such as Wickland, who was 56 years of age at the time.

87.  Defendant Rodriguez falsely and recklessly and without basis diagnosed Wickland as suffering from schizophrenia, even though Wickland was not presenting to Defendant Rodriguez as a person suffering from the standard and accepted symptoms of schizophrenia (*i.e.,* delusions, hallucinations, negative symptoms, or disorganized speech or grossly disorganized or catatonic behavior unrelated to the sedatives that Wickland had been forcibly given).

88.  Established and generally accepted practice requires the presence of two of more of schizophrenia's standard symptoms to be present for at least a 30-day period, and there was no basis for Defendant Rodriguez's conclusion that Wickland had any of schizophrenia's standard symptoms.

89.  On about March 9, 2021, Wickland provided the hospital staff with a written request to be released from her involuntary confinement at the Hospital.

90.  On March 12, 2021, Justice Phillip Hom of the New York Supreme Court for New York County conducted a hearing on the application by Defendants Kestelman and Rodriguez to continue Wickland's involuntary confinement for at least 60 days.

91.  On March 12, 2021, Justice Hom ordered Wickland released because NYCHHC, Defendant Kestelman, and Defendant Rodriguez were unable to show that Wickland was mentally ill or dangerous.

92.  Defendant Rodriguez thereafter admitted that she lacked a sufficient basis to hold Wickland against her will, as demonstrated at the March 12, 2021 hearing, and that she could not explain or justify the prior grounds for Wickland's involuntary commitment.

93.  NYCHHC and the Doctor Defendants are liable to Wickland because they failed to investigate the conclusory contention that Wickland was emotionally disturbed and was a danger to herself or others, and as a result, Wickland suffered needless loss of her liberty, was forcibly medicate, and was needlessly exposed to other traumatic experiences while locked in the psychiatric emergency room and an in-patient ward at Bellevue Hospital.

94.  NYCHHC and the Doctor Defendants are liable to Wickland because Wickland was physically restrained and forcibly injected with sedatives and other unwanted medications on multiple occasions.

95.    Upon information and belief, the medications injected into Wickland's body caused Wickland to act in a non-responsive manner, caused Wickland to move her arms or hands in an uncontrollable manner, and cause Wickland to bleed.

96.    Based on the effect of the sedatives and medications forcibly injected into Wickland's body, the Doctor Defendants erroneously and recklessly concluded that the non-responsiveness and erratic movements were caused by Wickland's purported mental illness, not the sedatives and medications forced upon Wickland.

97.    Defendant Doctors and Defendants John and Jane Roes ignored Wickland's stated objections to any mediation, and Defendants John and Jane Roes, acting at the direction of the Defendant Doctors, forced Wickland to be injected with sedatives and/or psychiatric drugs about ten times from February 25, 2021 through about March 12, 2021.

98.    Clinical standards require physicians assessing whether an individual poses a danger to herself or others as a result of mental illness to carefully probe the patient's mental status to determine whether or not a patient manifests factors, known as risk factors, which heighten the level of harm that a patient poses.

99.    Clinical standards further require physicians assessing dangerousness to assess the existence of mitigating factors, that is, factors that lower the risk of harm that a patient poses.

100.    At no time did Wickland present with any risk factors that might have heightened any risk of harm that she might have posed.

101.    The risk factors include, but are not limited to the following: (1) a violent behavior; (2) paranoid or delusional thinking, together with a history of acting under the delusions or hallucinations or an intent to act on delusions and hallucinations; (3) a lack of impulse control; and, (4) a present history of substance abuse and to a lesser extent, a past history

of substance abuse.

102.   The Doctor Defendants violated these clinical standards when they evaluated Wickland  to determine whether or not she met the criteria for involuntary hospitalization under the New York State Mental Hygiene Law.

103.  Based on the minimal (if any) time they spend evaluating Wickland, the Doctor Defendants could not have gathered the amount of information necessary to make an informed decision about how much risk Wickland posed to herself or others.

104.  As a result of her mistreatment at the hospital, Wickland was the victim of numerous assaults and batteries, was forcibly medicated on numerous times, was made to suffer severe emotional distress and lost her liberty and freedom.

105.  None of the defendants can establish any justification or privilege under law for Wickland's imprisonment or for their other treatment of Wickland.

106.   At no time before her admission, during her admission, or after Wickland's release, was Wickland dangerous to herself or others, and no reasonable person could have reached a conclusion that it was likely that Wickland was dangerous to herself or others.

107.   At no time did Wickland say anything or do anything that could possibly be rationally understood to suggest that she was dangerous to herself or others.

108.   Wickland never manifested any conduct or spoke any words that suggested that she was dangerous to herself or others.

109.   NYCHHC and the City of New York are liable for the wrongful actions of the individual defendants under the common law of New York State based on the theory of respondeat superior liability because their employees or agents were acting within the scope of their employment and under their control at the times relevant to this Complaint.

110.   The Doctor Defendants are liable under the common law of New York State as supervisors under the theory of vicarious liability for the actions of their subordinates, who were acting within the scope of their employment and under their control and direction.

  All the individual defendants in this action were acting as agents of each other.  Each individual defendant knew or reasonably should have known that the other individual defendants were engaging in the wrongful conduct alleged herein, and that this conduct would directly and proximately result in injury to Wickland.

**FIRST CLAIM FOR RELIEF**
**(Section 1983 Fourth Amendment;**
**False Arrest and Imprisonment,**
**and Excessive Force without Due Process)**

111.   Wickland repeats all the above allegations as if set forth herein at length.

112.   The individual City defendants, including without limitation Defendant Maldanado, were acting jointly and in concert at all times relevant to this case as state actors acting under color of state law.

113.   The individual City defendants, including without limitation Defendant Maldanado, jointly and separately, are liable to Wickland for their false arrest and false imprisonment of Wickland.

114.   The City and John and Jane Does Officers # 1 and 2 did not have probable cause to believe that Wickland was a danger to herself or others and there were no exigent circumstances that justified their arrest and imprisonment of Wickland as an emotionally disturbed person.

115.   The City and John and Jane Does Officers # 1 and 2 violated Wickland's rights under the Fourth Amendment of the United States Constitution by placing her in custody in handcuffs without any basis or grounds to believe that she was dangerous to herself or others and

by falsely arresting, imprisoning and taking Wickland to the hospital.

116.  Wickland was aware of her confinement, the defendants intended to confine Wickland, Wickland did not consent to it, and the City Defendants lacked any privilege or right to arrest or imprison Wickland.

117.  The City and John and Jane Does Officers # 1 and 2 are liable to Wickland for the damages and injuries and loss of liberty that she suffered at Bellevue Hospital because each such Defendant knew and should have known that it was likely that Wickland was going to be held by the NYCHHC Defendants against her will for a sustained period of time and that an involuntary admission or forced stay in the psychiatric emergency room at Bellevue Hospital would be emotionally traumatic for anyone.

118.  The City is liable for the conduct of John and Jane Does Officers # 1 and 2 because it is an established practice and policy of the NYPD not to discipline members of the NYPD who unlawfully employ their power to declare persons "emotionally disturbed" and that as a result of that practice and policy of not disciplining members of the NYPD for abusing their powers under the Mental Hygiene Law and Patrol Guide 216-05, members of the service, including John and Jane Does Officers # 1 and 2, act with impunity.

119.  Upon information and belief, the NYPD does not, or does not adequately, enforce or discipline violations of the law or Patrol Guide 216-05, governing the proper use of the power to declare a person emotionally disturbed.

120.  Upon information and belief, the NYPD has a practice of resolving EDP calls emanating from the 911 system by placing the burden on the target of the 911 call to prove to responding police officers that the target is not dangerous or in need of emergency medical or psychiatric attention in violation of state law and a person's due process rights to liberty.

121.  Upon information and belief, it is the policy, custom and practice of the NYPD to inadequately discipline its staff, thereby failing to discourage constitutional violations.

122.  As a result of those practices, policies and customs, members of the NYPD, including the individual City Defendants in this action, believe that their actions will not be monitored and that their misconduct will not punished because the attitude created by the NYPD fosters and creates an "anything goes" attitude where police officers can arbitrarily deem a person emotionally disturbed without fear or concern that they will be disciplined for such misconduct.

123.  By failing to properly enforce through discipline the rules of law governing when a person can be properly deemed emotionally disturbed, the City of New York has given the members of the service de facto and unduly broad discretion to invoke those powers without any limitations imposed on the arbitrary abuse of that power.

124.  The City of New York is and has been deliberately indifferent to the fact that members of the NYPD routinely misuse their powers under the Mental Hygiene Law and Patrol Guide 216-05, and the City of New York's deliberate indifference in fact caused the false arrest and imprisonment of Wickland.

125.  As a result of the defendants' conduct, each of them are liable to Wickland for compensatory and punitive damages in an amount to be established as trial under 42 U. S. C. § 1983.

## SECOND CAUSE OF ACTION
### (Section 1983 False Imprisonment, Excessive Force, False Imprisonment, Assault and Battery)

126.  Wickland repeats all the above allegations as if set forth herein at length.

127.  NYCHHC, the Doctor Defendants, and John and Jane Roes # 1-10 , are liable to

Wickland for damages under 42 U. S. C. Section 1983 for assault, excessive force, false arrest and false imprisonment because they held Wickland against her will and without her consent without excuse, justification or privilege and because they assaulted Wickland and used excessive and unjustified force against her.

128.   The Doctor Defendants, and John and Jane Roes # 1-10 were at all relevant times acting as state actors for a public corporation and were acting unlawfully under color of state law.

129.   The Defendant Doctors and John and Jane Roes # 1-10 are liable to Wickland for assault, battery and excessive force upon Wickland when they attacked Wickland, physically restrained Wickland, and injected her with sedatives against her will and without justification or consent.

130.   At no time was Wickland dangerous to herself or others and no reasonable person could have reached a conclusion that it was likely that Wickland was dangerous to herself or others.

131. At no time did Wickland say anything or do anything that could possibly be rationally understood to suggest that she was dangerous to herself or others.

132.   Wickland never manifested any conduct or spoke any words that suggested that she was dangerous to herself or others.

133.   NYCHHC is liable for the conduct of its individual staff members because it is an established practice and policy of the NYCHHC at Bellevue not to discipline members of its staff who use excessive force or unlawfully employ their power to commit persons as dangerous and emotionally disturbed and that as a result of that practice and policy of not disciplining its Bellevue staff for abusing their powers under the Mental Hygiene Law, members of the staff, including the individual defendants act with impunity.

134.   Upon information and belief, NYCHHC does not, or does not adequately enforce violations of the law governing the proper use of force or the power to declare a person emotionally disturbed.

135.   Upon information and belief, it is the policy, custom and practice of the NYCHHC to inadequately discipline its staff, thereby failing to discourage constitutional violations.

136.   As a result of those practices, policies and customs, members of the NYCHHC, including the individual NYCHHC defendants in this action, believe that their actions will not be monitored and that misconduct will not punished because the attitude created by the NYCHHC fosters and creates an "anything goes" attitude where Bellevue staff members and doctors can use unjustified and excessive force or arbitrarily deem a person emotionally disturbed and dangerous without fear or concern that they will be disciplined for such misconduct.

137.   By failing to properly enforce through discipline the laws and regulations governing the use of force, the use of sedatives and the involuntary hospitalization of persons alleged to be mentally ill and dangerous, NYCHHC has given its staff and doctors de facto discretion to invoke their powers over patients without any limitations imposed on the arbitrary abuse of that power.

138.   NYCHHC is and has been deliberately indifferent to the fact that members of the NYCHHC routinely misuse their powers.  That deliberate indifference caused the assault and false arrest and imprisonment of Wickland.

139.  As a result, NYCHHC is jointly and severally liable to Wickland under 42 U. S. C. Section 1983 for compensatory and punitive damages caused by the individual defendants' unlawful conduct.

### THIRD CLAIM FOR RELIEF
### (Common Law False Arrest and False Imprisonment)

140.   Wickland repeats all the above allegations as if set forth herein at length.

141.   Defendants, the City of New York, the NYPD John and Jane Doe # 1 and 2, and John and Jane Does # 3-10 are liable to Wickland for false arrest and false imprisonment under the common law of the State of New York arising from their conduct on February 25, 2021.

142.   Defendants NYCHHC, the Doctor Defendants, and Defendants John and Jane Roes # 1-10 are liable to Wickland for false arrest and false imprisonment under the common law of the State of New York arising from the events that occurred from February 25, 2021 through March 12, 2021.

143.  As a result, said Defendants are liable to Wickland for compensatory and punitive damages in an amount to be established at trial.

### FOURTH CLAIM FOR RELIEF
### (Common Law Assault and Battery)

144.  Wickland repeats all the above allegations as if set forth herein at length.

145.  Defendants, the City of New York, Defendant Maldanado, John and Jane Doe # 1 and 2, and John and Jane Does # 3-10, are liable to Wickland for assault and battery under the common law of the State of New York arising from their conduct on February 25, 2021 because they:  (a) made (or caused to be made) bodily contact with Wickland, made such contact intentionally, and such contact was offensive in nature; and (b) intentionally placed Wickland in apprehension of imminently harmful or offensive contact.

146.  Defendants NYCHHC, the Doctor Defendants, and Defendants John and Jane Roes # 1-10, are liable to Wickland for assault and battery under the common law of the State of New York arising from their conduct at Bellevue Hospital from February 25, 2021 through

March 12, 2021 because they:  (a) made (or caused to be made) bodily contact with Wickland, made such contact intentionally, and such contact was offensive in nature; and (b) intentionally placed Wickland in apprehension of imminently harmful or offensive contact.

147.  As a result, said Defendants are liable to Wickland for compensatory and punitive damages in an amount to be established at trial.

## FIFTH CLAIM FOR RELIEF
### (Common Law Emotional Distress Damages)

148.  Wickland repeats all the above allegations as if set forth herein at length

149.  All the defendants, jointly and separately, are liable to Wickland for intentional, reckless, grossly negligent, and negligent infliction of emotional distress.

150.  The defendants' conduct was extreme and outrageous conduct that was intended to cause Wickland severe emotional distress and did cause her severe emotional distress.

151.  The defendants committed the acts alleged herein maliciously, fraudulently and oppressively with the wrongful intention of injuring Wickland, for an improper motive amounting to malice and in conscious disregard of Wickland's rights, entitling her to recover punitive damages in an amount to be proven at trial.

152.  As a proximate result of the defendants' conduct, Wickland has suffered and continues to suffer extreme emotional distress.

153.  As a result of the defendants' conduct, each of them is jointly and severally liable to Wickland for compensatory and punitive damages caused by their unlawful conduct.

## SIXTH CLAIM FOR RELIEF
### (Negligent Infliction of Emotional Distress)

154.  Wickland repeats all the above allegations as if set forth herein at length.

155.  All the defendants, jointly and separately are liable to Wickland for negligent

infliction of emotional distress.

156.   The individual defendants each owed Wickland a duty to act with reasonable care and the damages and suffering caused to Wickland by the defendants was reasonably foreseeable.

157.   At all relevant times, the defendants had the power, ability, authority and duty to stop the conduct described herein and to intervene to prevent or prohibit such conduct.  Rather than exercise that power, the defendants each acquiesced to the conduct of others that damaged and injured Wickland.

158.   At all relevant times, all the defendants knew, or reasonably should have known, that the conduct described herein would and did proximately result in Wickland's emotional distress.

159.   Despite said knowledge, power, and duty, the defendants negligently failed to stop engaging in the conduct described herein and negligently failed to prevent or to prohibit such conduct or otherwise to protect Wickland, thereby breaching their duty to her.

160.   The individual defendants unreasonably endangered Wickland's physical safety and caused Wickland to fear for her own safety.

161.   As a result of the defendants' conduct, all of them are jointly and severally liable to Wickland for compensatory and punitive damages in an amount to be established at trial.

## SEVENTH CLAIM FOR RELIEF
### (Negligent Care and Treatment)

162.   Wickland repeats all the above allegations as if set forth herein at length.

163.   NYCHHC, the Doctor Defendants, and Defendants John and Jane Roes # 1-10, jointly and separately, are liable to Wickland for negligence in the careless, reckless and improper way that they evaluated and treated Wickland.

164. NYCHHC, the Doctor Defendants, and Defendants John and Jane Roes # 1-10, owed Wickland a duty of care and they breached that duty, causing Wickland damages.

165. As a result of the defendants' conduct, each of them is jointly and severally liable to Wickland for damages caused by their unlawful conduct.

**EIGHTH CLAIM FOR RELIEF**
**(Negligent Staffing, Hiring, Training and Supervision)**

166. Wickland repeats all the above allegations as if set forth herein at length.

167. Defendant NYCHHC failed to properly staff and failed to sufficiently staff its psychiatric emergency room, and it negligently selected, hired, trained, retained, assigned and supervised its staff, including the Doctor Defendants, and Defendants John and Jane Roes # 1-10.

168. NYCHHC was negligent and careless when it poorly and insufficiently staffed its psychiatric emergency room and its psychiatric wards, and when it selected, hired, trained, retained, assigned, and supervised its staff, including the Doctor Defendants, and Defendants John and Jane Roes # 1-10.

169. NYCHHC had the authority to supervise, prohibit, control, and regulate the Doctor Defendants, and Defendants John and Jane Roes # 1-10 so as to prevent these acts and omissions from occurring.

170. NYCHHC knew or reasonably should have known that unless they properly and sufficiently staffed, supervised, prohibited, controlled, and/or regulated its psychiatric emergency room and its psychiatric wards, and the conduct of the Doctor Defendants, and Defendants John and Jane Roes # 1-10, those individual defendants would perceive their acts and omissions as being ratified and condoned.

171. NYCHHC failed to exercise due care by failing to properly staff, supervise,

prohibit, control, or regulate the Doctor Defendants, and Defendants John and Jane Roes # 1-10 and/or by failing to protect Wickland.

172.    As a direct and proximate result of the Doctor Defendants' and Defendants John and Jane Roes # 1-10's acts and omissions, Wickland has suffered and continues to suffer injuries entitling her to damages in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF
### (Negligence – All Defendants)

173.    Wickland repeats all the above allegations as if set forth herein at length.

174.    All the defendants owed Wickland a duty of care and breached that duty by their negligent conduct, which caused Wickland damages in an amount to be established at trial.

WHEREFORE, Plaintiff demands that judgment be entered against each of the Defendants, jointly and severally, for compensatory damages, for punitive damages, for reasonable attorneys' fees, expert's fees, costs and expenses of this action pursuant to 42 U. S. C. § 1988 together with interest thereon as provided by law and such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  February 24, 2022

s/Nathaniel B. Smith
*s/Nathaniel B. Smith*
Nathaniel B. Smith
225 Broadway – Suite 1901
New York, NY 10007
212-227-7062
natbsmith@gmail.com

William Brooks, Esq.
Of Counsel