UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                          :

ALLISON C. WICKLAND,                :

               Plaintiff,        :        **22-cv-1554-RA-OTW**

       v.                        :

                                            :        **FIRST AMENDED
COMPLAINT**
THE CITY OF NEW YORK; DARINKA MALDANADO (a/k/a  :
"MALDONADO"), TAYLOR RUSCILLO, CAMERON        :
LONGLEY, BENJAMIN QUINN, NYPD POLICE OFFICERS  :
AND FDNY/EMT OFFICERS JOHN AND JANE DOES; NEW  :
YORK CITY HEALTH AND HOSPITALS CORPORATION;    :
DOCTOR PAUL POULAKOS; DOCTOR HAGOP HAJAIN;    :
DOCTOR RACHAEL JOHNSTON RODRIGUEZ; DOCTOR   :
DANIEL KESTELMAN; DOCTOR DANIEL ECKROTH;      :
DOCTOR AMANY GALA; DOCTOR LEO LOPEZ, JOHN     :
AND JANE ROES,                                    :

                   Defendants.         :

                                            :

                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      Plaintiff, Allison C. Wickland, by the undersigned attorneys, hereby alleges as and for her

Complaint the following:

## INTRODUCTION

      1.  Plaintiff, Allison C. Wickland ("Wickland"), brings this action against the above-

referenced Defendants, jointly and severally, to vindicate her civil rights and to recover

compensatory and punitive damages against each of the Defendants.

      2.   In February of 2021 Wickland left her home in Brooklyn, where she was living

with her mother, and went to a housing agency of the City of New York to find affordable

housing for herself.  She never should have gone to the City of New York for help.

3.   After remaining in a quasi-form of COVID quarantine for nine days at Manhattan Holiday Inn being run by the City of New York (the "City"), on February 25, 2021, Wickland refused to grant the City permission to administer to her an unspecified COVID test on the ground that she had already agreed to remain in quasi-quarantine in lieu of a COVID test.  When the City employees became verbally aggressive with Wickland and insisted that Wickland grant them permission to take the test—even though Wickland was not sick, had no symptoms, and was about to have the quasi-quarantine restrictions lifted—Wickland became concerned that they were going to forcibly administer a medical test on her.

4.   Wickland called 911 to get assistance because she did not feel safe, and in retaliation, Defendant Darinka Maldanado (a/k/a "Maldonado"), who was managing the hotel for the City, also called 911, falsely and maliciously claiming that Wickland was an emotionally disturbed person.

5.   Wickland was not an emotionally disturbed person, was not suffering from any mental illness, and was not acting in a way that could reasonable be viewed as dangerous to herself or others.  Nevertheless, Defendant NYPD Police Officers and EMT Officers who responded to the scene arrested Wickland on February 25, 2021 and arranged for the FDNY's EMT personnel to transport Wickland against her will under NYPD escort to the psychiatric emergency room at Bellevue Hospital as an emotionally disturbed person needing emergency attention.

6.   At Bellevue Hospital, Wickland was falsely labeled as a "homeless" street person living in a "shelter" and was repeatedly diagnosed and re-diagnosed as a dangerous and a mentally ill schizophrenic by Defendants Doctors Paul Poulakos, Hagop Hajain, Rachael Johnston Rodriguez, Daniel Kestelman, Daniel Eckroth and Amany Galal, all of whom work at

Bellevue Hospital.

7.   As a result of the false and groundless diagnosis, Wickland, who was a 56 year old woman at the time with no psychiatric history, was physically assaulted by large and aggressive men working at Bellevue, stripped of her clothing, placed in physical restraints, forcible injected by hypodermic needless with unwanted and needless psychiatric drugs on numerous occasions, and held against her will without basis, justification or privilege for 15 days from February 25, 2021 through March 12, 2021, when a New York State Supreme Court Justice ordered her release because Bellevue failed to establish any basis for Wickland's involuntary commitment.

8.   As set forth in more detail below, Wickland sues the Defendants for damages in an amount to be established at trial for the loss of Wickland's liberty, for the violation of her right to due process, her right to speak or not to speak, her right to be free of assault and battery, her right to be free of unwanted and forced medical treatment and for the violations on her humanity and the degrading, humiliating and offensive treatment she received at the hands of the Defendants.

## PARTIES

9.   Plaintiff Wickland is a black woman and a resident of the City of New York.

10.   Defendant, the City of New York (the "City") is a municipal corporation duly organized and existing under the laws of the State of New York.

11.   The City is a "person" for purposes of the enforcement of the rights guaranteed under 42 U. S. C. §§ 1981 & 1983.

12.   Defendant Darinka Maldanado (a/k/a "Maldonado") was as of February 25, 2021, upon information and belief, an employee or agent of the City working as the manager or director

of a Holiday Inn hotel being operated and controlled by the City and at 538 West 48th Street, New York, New York.

13.   Defendants Taylor Ruscillo, Cameron Longley, and other John and Jane Doe Officers were uniformed members of the New York City Police Department as of February 25, 2021, who unlawfully and falsely arrested and imprisoned Wickland on February 25, 2021 without probable cause to believe that Wickland satisfied the criteria for the detention and transport of a person who suffered from mental illness or was either mentally ill or dangerous to herself or others.

14.   Defendant, Benjamin Quinn, and Defendants, other John and Jane Does, were at the relevant time employees of City of New York working at the New York City Fire Department (FDNY") as Emergency Medical Technicians ("EMTs").

15. Defendants John and Jane Does were at the relevant time employees of City of New York working as staff at the Holiday Inn hotel located at 538 West 48th Street, New York, New York.

16.   Defendant, The New York City Health and Hospitals Corporation ("NYCHHC"), is a New York public benefits corporation organized and operating in the laws of the State and the City of New York.

17.   Defendants Doctors Paul Poulakos, Hagop Hajain, Rachael Johnston Rodriguez, Daniel Kestelman, Daniel Eckroth, Amany Gala, and Leo Lopez  (hereinafter collectively the "Doctor Defendants") were employees or agents of NYCHHC working at Bellevue Hospital Center, 462 First Avenue, New York, New York 10016 ("Bellevue" or the "Hospital") during the period from February 25, 2021 through March 12, 2021.

18.   Defendants, John and Jane Roes, were at the time relevant to this action working

at Bellevue in their capacities as security guards, nurses, doctors, or aides thereto (collectively, the "NYCHHC or the "John and Jane Roe Defendants"), who participated in the misconduct and mistreatment of Wickland from February 25, 2021 through March 12, 2021, as set forth in greater detail below.

## JURISDICTION AND VENUE

19.   Federal jurisdiction is based on 28 U. S. C. §§ 1331 and 1343(a)(3)-(4) for the federal claims, and supplemental jurisdiction over the New York common law claims is based on 28 U. S. C. § 1367(a) because those claims arise from a common nucleus of operative facts and are intertwined with the federal claims.

20.   Wickland has fully complied with all administrative prerequisites to filing this suit by the filing of a Notice of Claim with the City of New York and with the NYCHHC within the time required by local law and has otherwise complied with all other prerequisites to suit.

21.   Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U. S. C. §§ 1391 (b) & (c).

## STATEMENT OF FACTS

22.   At the time of the events relevant to this Complaint, Wickland was 56 years old.

23.   Wickland has never been diagnosis with any kind of mental illness at any time in her life and has never sought or presented herself to any kind of mental health profession for treatment for any kind of mental illness.

24.   In February of 2021, Wickland decided to seek new housing and to move from her residence in Brooklyn, where she was living with her mother, to affordable housing in the City of New York.

25.   In order to find affordable housing for herself, Wickland sough assistance from a

City housing agency commonly referred to as the Human Resources Agency.

26.   At that time and at all other times relevant to this Compliant, Wickland was medically and mentally healthy and was capable of, and was caring for, all of her personal needs without assistance or intervention by anyone.

27.   On about February 15, 2021 and because of the COVID pandemic, Wickland was offered temporary housing at a Holiday Inn hotel in mid-town Manhattan located at 538 West 48th Street, New York, New York.  A photograph of the hotel is reprinted below in paragraph 64.

28.   The hotel is located within the confines of the NYPD's Midtown North Precinct.

29.   The hotel was being operated and controlled by the City of New York and its employees and agents were running the hotel's operations.

30.   When Wickland checked into the hotel, hotel staff provided her with two options regarding protocols for the COVID pandemic:  Wickland could undergo certain undefined tests to determine whether she had COVID; or Wickland could remain in the hotel for about 11 days and during that 11-day period have her temperature and oxygen levels check every 24 hours with a thermometer gun and a finger-tip oxygen level indicator.

31.   Wickland opted for the second option because that option appeared to her to be less intrusive and invasive than the ill-defined COVID-test option.

32.   For the next nine days, Wickland complied with the COVID protocols.

33.   During their morning or evening rounds at the hotel, City employees dressed in yellow or blue medical gowns measured and recorded Wickland's temperature and her oxygen levels, all of which were normal or within normal ranges.

34.   On the morning of February 25, 2021, however, two City employees came to Wickland's door and told her that she had to subject herself to the COVID tests that she had

previously declined.

35.   Rather than admit the two employees into her room, Wickland stepped out into the hallway and attempted to explain to them that, as previously arranged, she did not have to take the COVID tests.

36.   More specifically, during her discussions with the two City employees, Wickland explained to the two City employees that she did not have to take the COVID tests because she had been complying with the quasi-quarantine option of having her temperature and oxygen levels taken at least once every 24 hours.

37.   The two City employees, however, did not accept Wickland's statements to them and began telling Wickland in an increasingly aggressive manner that she had no choice and that a COVID test was going to be administered with or without her consent.

38.   As the discussion progressed in the hallway outside Wickland's room, other hotel staff and other hotel occupants began to gather around Wickland, and as the crowd gathered, Wickland began to feel more and more unsafe.

39.   As a result of her inability to resolve the situation and as a result of her increasing concerns for her safety, Wickland called 911 that morning, somewhere between about 8:30 am and 9:30 am, and told the 911 operator that she was feeling unsafe and wanted the police to respond to the situation.

40.   While Wickland waited for the police to respond, a large group of individuals, consisting of hotel staff and hotel guests, began crowding around the entrance to Wickland's room.

41.   At one point while the crowd was pressing into Wickland's space, Wickland saw a person who she believed to be another guest at the hotel walk behind her and Wickland came to

believe that the person was trying to go into her room and possibly steal from her.

42.   After waiting what seemed to be an extended period of time for the police to respond, eventually two EMTs, including Defendant Benjamin Quinn, from the FDNY appeared at the scene at about 11:00 AM and began to ask Wickland whether she needed any medical attention.

43.   Wickland did not at the time understand why medical or EMT personnel appeared at the hotel to inquire about her medical condition because she did not call for medical attention; instead, Wickland expect the police to arrive in response to her call to 911.

44. Wickland has now come to understand and believe that Defendant Darinka Maldanado called 911 to report Wickland as an "emotionally disturbed person" after and because Defendant Maldanado learned that Wickland had previously called 911.

45. The two EMTs who responded to the scene spoke to Wickland about the situation and after apparently evaluating her, stated at the end of the interview that Wickland was fine and did not need further medical attention.

46.   Wickland confirmed with Defendant Quinn that she had no history of mental illness and was not taking any kind of medication for any such illness.

47.   At about 11:30 AM that morning, however, two uniformed NYPD police officers, Defendants Taylor Ruscillo and Cameron Longley, arrived at the scene in front of Wickland's room.

48.   Upon information and belief, the two officers, Defendants Ruscillo and Longley came from the NYPD's Midtown North Precinct and arrived at the scene in response to the call from Defendant Darinka Maldanado, who claimed falsely that Wickland was acting like an emotionally disturbed person.

49.   Defendants Quinn recognized that Wickland did not attempt to physically harm herself or others, did not place herself in a dangerous situation, did not physically threaten others, did not verbally threaten others, did not speak of harming herself or others and did not demonstrate that she lacked the ability to care for herself.

50.   Defendants Ruscillo and Longley recognized that Wickland did not attempt to physically harm herself or others, did not place herself in a dangerous situation, did not physically threaten others, did not verbally threaten others, did not speak of harming herself or others and did not demonstrate that she lacked the ability to care for herself.

51. Defendants Ruscillo, Longley and Quinn knew that they had no basis to declare Wickland as an emotionally disturbed person or to remove her to the hospital, and in derogation of their duties and responsibilities they determined to remove Wickland and take her to the hospital merely because the staff at the hotel told them that they, the hotel staff, wanted her to be removed.

52. Defendants Ruscillo, Longley and Quinn knew that hotel staff did not have the authority to declare a person an emotionally disturbed person, and without basis and in total derogation of their known duties and responsibilities, declared Wickland an emotionally disturbed person based solely on the request of hotel staff, thereby utterly jettisoning their authority and unlawfully deferring to hotel staff in an act that no reasonably competent and law-abiding member of the NYPD or the FDNY would have undertaken

53.   Defendants Ruscillo and Longley, aided by Defendant Quinn and others, handcuffed Wickland, needlessly and physically forced her onto a gurney, and, after placing Wickland into an awaiting FDNY ambulance, escorted Wickland to Bellevue Hospital Center.

54. Defendants Ruscillo, Longley and Quinn then authorized Wickland's transport to

Bellevue Hospital.

55. Under the New York Mental Hygiene Law, Defendants Ruscillo and Longley possessed the ability to authorize the transport of Wickland only if she was mentally ill and dangerous with her dangerousness being manifested by homicidal or other violent behavior, attempts or threats at suicide or other conduct that demonstrated that she posed a danger to herself.

56. Defendant Ruscillo and Longley knew that: Wickland did not attempt to physically harm herself or others; did not place herself in a dangerous situation; did not physically threaten others; did not verbally threaten others; did not speak of harming herself or others; and did not demonstrate that she lacked the ability to care for herself.

57. As such, they lacked probable cause to believe that she was mentally ill or was a danger to herself or others in that no possible dangerousness manifested by homicidal or other violent behavior, attempts or threats at suicide or other conduct showed or suggested that she posed a danger to herself or others.

58. Wickland was unlawfully taken to Bellevue Hospital against her will and without excuse or justification based on the false designation of Wickland as a dangerous and emotionally disturbed person.

59. Upon information and belief, Defendant Ruscillo and Longley arrested Wickland and took her to Bellevue merely because she was "irate" and merely because Maldonado and other staff at the hotel told them that they wanted Wickland to be removed.

60. Wickland had done absolutely nothing that would suggest to a reasonable person or a reasonable police officer or a reasonable EMT that she was dangerous, mentally ill, or in need of emergency medical or psychiatric attention.

61.   Defendants Ruscillo and Longley arrested Wickland as an "EDP" because that was the simplest way to end the incident and move on to their next assignment.

62.   Upon information and belief, the NYPD has a practice of resolving EDP calls emanating from the 911 system by placing the burden on the target of the 911 call to prove that the target is not dangerous or in need of emergency medical or psychiatric attention in violation of state law and a person's due process rights to liberty.

63.   At about noon on February 25, 2021, Wickland arrived at Bellevue Hospital.

64.   From the time Wickland arrived at Bellevue Hospital every doctor who evaluated her spent no more than a few minutes evaluating her.  From the time Wickland arrived at Bellevue Hospital it was clear to her that, based upon what the doctors had said to her, that the decision had already been made to keep Wickland at Bellevue and it was only a matter of Wickland adjusting to the hospital routine.

65.   Upon information and belief, Wickland first encountered Defendant Paul Poulakos, who is a Doctor of Osteopathy employed by Defendant NYCHHC.  Defendant Poulakis observed Wickland for a matter of a few minutes and falsely and recklessly diagnosed her as having a mental illness, being dangerous to herself, and in need of emergency psychiatric attention.

66.   Defendant Poulakos did not conduct the necessary or appropriate evaluation of Wickland and only spent a few minutes observing Wickland, which was patently inadequate under good and accepted practices to conduct a psychiatric evaluation.

67.   Defendant Poulakos and thereafter the other Doctor Defendants incorrectly concluded without any basis that Wickland was homeless street person and that she had been brought to the hospital from a homeless shelter run by the City.

68.   The Holiday Inn hotel was not, as shown below, a homeless shelter:



69.   Based on these incorrect and baseless assumptions about Wickland, Defendant Poulakos and the other Doctor Defendants simply stop or never employed any kind of independent, professional judgment about Wickland and simply assumed that she was a mentally ill, homeless, black, and impoverish street person woman.

70.   Defendant Poulakos signed the orders to involuntarily admit Wickland without basis because he was unwilling to spend the time necessary to gain the trust and confidence of Wickland.

71.   Defendant Poulakos signed the orders to involuntarily admit Wickland because

he was unwilling and unable to obtain information about Wickland from Wickland and improperly imposed on Wickland the burden of proving that she was not mentally ill or dangerous, in violation of Wickland's right to due process, and in violation of her rights to remain silent and not to speak, all as guaranteed by the First, Fifth and Fourteenth Amendments to the United States Constitution.

72.   Without any basis, Defendant Amany Gala, an NYCHHC employee and doctor, merely relied on the conclusory and inadequate evaluation by Defendant Poulakos.

73.   On February 25, 2021, both Defendants Poulakos and Gala approved of the continued involuntary admission and imprisonment of Wickland to the hospital on the grounds that Wickland was likely to be mentally ill, dangerous and in need of emergency medical or psychiatric attention.

74.   Wickland had done absolutely nothing at the hospital (or at the hotel) that would suggest to a reasonable person or a reasonable doctor that she was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention.

75.   Without any basis and in violation of Wickland's rights, on about February 25, 2021, Defendant Eckroth directed and authorized hospital staff to place Wickland in physical restraints and ordered that Wickland be given sedatives against Wickland's will.

76.   On numerous occasions while Wickland was being held at the hospital, hospital staff, acting under the orders by the Doctor Defendants, placed Wickland in unnecessary and unduly restrictive restraints on Wickland that caused her severe pain and bruising.

77.   Throughout her time at Bellevue Hospital, Wickland repeatedly told the Doctor Defendants and the Bellevue Hospital staff that she did not want any drugs or sedatives for any reason.

78.   On numerous occasions while Wickland was being held at the hospital, hospital staff, acting under the orders of the Doctor Defendants, forcible injected Wickland with sedatives that rendered Wickland unconscious for hours or for days.

79.   The forcible injections occurred about six to eight times while Wickland was being held at Bellevue.

80.   On the first such occasion, after Wickland was forcibly injected with a sedative, she woke up about two days later and discovered that her clothing had been removed form her body while she was unconscious and that somebody had dressed her in a hospital gown.

81.   As a result of her treatment at the hospital, Wickland did not believe that the staff or doctors were acting in her best interests and avoided contact with them as much as possible.

82.   Two days later, on about February 27, 2021, Defendant Hajain approved of the continued involuntary admission and imprisonment of Wickland on the ground that Wickland was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention.

83.   Wickland had done absolutely nothing at the hospital (or elsewhere) that would suggest to Defendant Hajain or a reasonable person or a reasonable doctor that she was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention, and no information had come to Defendant Hajain's attention that would have led a reasonable person or a reasonable doctor that Wickland was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention.

84.   Defendant Hajain approved of Wickland's continued involuntary admission because Defendant Hajain was unwilling to spend the time required to gain the trust and

confidence of Wickland and because he improperly imposed on Wickland the burden of proving that she was not mentally ill or dangerous, in violation of Wickland's rights under the United States Constitution.

85.  About five days later, on about March 2, 2021, Defendants Kestelman and Rodriguez authorized the continued involuntary admission and imprisonment of Wickland at Bellevue Hospital for up to 60 days, pending a hearing.

86.  Wickland had done absolutely nothing at the hospital (or elsewhere) that would suggest to Defendant Kestelman or Defendant Rodriguez or a reasonable person or a reasonable doctor that Wickland was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention, and no information had come to Defendant Kestelman's or Defendant Rodriguez's attention that would have led a reasonable person or a reasonable doctor that Wickland was or was likely to be dangerous, mentally ill, or in need of emergency medical or psychiatric attention.

87.  Defendant Kestelman or Defendant Rodriguez approved of Wickland's continued involuntary admission because they were unwilling to spend the time required to gain the trust and confidence of Wickland and because they improperly imposed on Wickland the burden of proving that she was not mentally ill or dangerous, in violation of her rights under the United States Constitution.

88.  Defendant Rodriguez falsely and recklessly and without basis diagnosed Wickland as suffering from schizophrenia, even though such a diagnosis required that the symptoms of schizophrenia be present for a significant portion of time during a one-month period before such a diagnosis could be given.

89.  Defendant Rodriguez falsely and recklessly and without basis diagnosed

Wickland as suffering from schizophrenia, even though she knew Wickland had no documented

psychiatric history and even though Defendant Rodriguez knew or should have known that it is

well know and established among psychiatrist that schizophrenia typically arises in young adults

by their late twenties or thirties and that it is very rare to be first presented or diagnosed in a older

person, such as Wickland, who was 56 years of age at the time.

90.  Defendant Rodriguez falsely and recklessly and without basis diagnosed

Wickland as suffering from schizophrenia, even though Wickland was not presenting to

Defendant Rodriguez as a person suffering from the standard and accepted symptoms of

schizophrenia (*i.e.,* delusions, hallucinations, negative symptoms, or disorganized speech or

grossly disorganized or catatonic behavior unrelated to the sedatives that Wickland had been

forcibly given).

91.  Established and generally accepted practice requires the presence of two of more

of schizophrenia's standard symptoms to be present for at least a 30-day period, and there was no

basis for Defendant Rodriguez's conclusion that Wickland had any of schizophrenia's standard

symptoms.

92.  On March 3, 2021,Defendant Leo Lopez took steps to facilitate the involuntary

confinement of Wickland by applying for the sixty-day period of confinement as required by the

New York Mental Hygiene Law.  For the reasons set forth in this Complaint, Defendant Lopez

had no basis to conclude that Wickland suffered from mental illness and posed a danger to

herself or others.

93. On March 3, 2021, Roe Defendant # 2 facilitated the continued confinement of

Wickland by confirming the need for involuntary care and treatment even though no basis

existed for Roe Defendant # 2 to conclude that Wickland suffered from mental illness or posed a

danger to herself or others.

94.  On about March 9, 2021, Wickland provided the hospital staff with a written request to be released from her involuntary confinement at the Hospital.

95.  On March 12, 2021, Justice Phillip Hom of the New York Supreme Court for New York County conducted a hearing on the application by Defendants Kestelman and Rodriguez to continue Wickland's involuntary confinement for at least 60 days.

96.  On March 12, 2021, Justice Hom ordered Wickland released because NYCHHC, Defendant Kestelman, and Defendant Rodriguez were unable to show that Wickland was mentally ill or dangerous.

97.  Defendant Rodriguez thereafter admitted that she lacked a sufficient basis to hold Wickland against her will, as demonstrated at the March 12, 2021 hearing, and that she could not explain or justify the prior grounds for Wickland's involuntary commitment.

98.  NYCHHC and the Doctor Defendants are liable to Wickland because they failed to expeditiously investigate the conclusory contention that Wickland was emotionally disturbed and was a danger to herself or others, and as a result, Wickland suffered needless loss of her liberty, was forcible mediate, and was needlessly exposed to other traumatic experiences while locked in the psychiatric emergency room and an in-patient ward at Bellevue Hospital.

99.  NYCHHC and the Doctor Defendants are liable to Wickland because Wickland was physically restrained and forcibly injected with sedatives and other unwanted medications on multiple occasions.

100.  Upon information and belief, the medications injected into Wickland's body caused Wickland to act in a non-responsive manner, caused Wickland to move her arms or hands in an uncontrollable manner, and cause Wickland to bleed.

101.   Based on the effect of the sedatives and medications forcibly injected into Wickland's body, the Doctor Defendants erroneously and recklessly concluded that the non-responsiveness and erratic movements were caused by Wickland's purported mental illness, not the sedatives and medications forced upon Wickland.

102.   Defendant Doctors and Defendants John and Jane Roes ignored Wickland's stated objections to any mediation, and Defendants John and Jane Roes, acting at the direction of the Defendant Doctors, forced Wickland to be injected with a sedative and/or psychiatric drugs on numerous occasions from February 25, 2021 through about March 12, 2021.

103.   As a result of her mistreatment at the hospital, Wickland was the victim of numerous assaults and batteries, was forcibly medicated on numerous times, was made to suffer severe emotional distress and lost her liberty and freedom.

104.   None of the defendants can establish any justification or privilege under law for Wickland's imprisonment or for their other treatment of Wickland.

105.   At no time before her admission, during her admission, or after Wickland's release, was Wickland dangerous to herself or others, and no reasonable person could have reached a conclusion that it was likely that Wickland was dangerous to herself or others.

106.   At no time did Wickland say anything or do anything that could possibly be rationally understood to suggest that she was dangerous to herself or others.

107.   Wickland never manifested any conduct or spoke any words that suggested that she was dangerous to herself or others.

108.   NYCHHC and the City of New York are liable for the wrongful actions of the individual defendants under the common law of New York State based on the theory of respondeat superior liability because their employee or agents were acting within the scope of

their employment and under their control at the times relevant to this Complaint.

109.  The Doctor Defendants are liable under the common law of New York State as supervisors under the theory of vicarious liability for the actions of their subordinates, who were acting within the scope of their employment and under their control.

110. All the individual defendants in this action were acting as agents of each other. Each individual defendant knew or reasonably should have known that the other individual defendants were engaging in the wrongful conduct alleged herein, and that this conduct would directly and proximately result in injury to Wickland.

### FIRST CLAIM FOR RELIEF
### (Section 1983 Fourth Amendment;
### False Arrest and Imprisonment,
### and Excessive Force without Due Process)

111.  Wickland repeats all the above allegations as if set forth herein at length.

112.  All individual defendants were acting jointly at all times relevant to this case as state actors acting under color of state law.

113.  The individual defendants, jointly and separately, are liable to Wickland for their false arrest and false imprisonment of Wickland.

114.  The City, Defendant Ruscillo, Longley and Quinn did not have probable cause to believe that Wickland was a danger to herself or others and there were no exigent circumstances that justified their arrest and imprisonment of Wickland as an emotionally disturbed person.

115.  The City, Defendant Ruscillo, Longley and Quinn violated Wickland's rights under the Fourth Amendment of the United States Constitution by placing her in custody in handcuffs without any basis or grounds to believe that she was dangerous to herself himself or others and otherwise did not meet the criteria for involuntary transport to Bellevue because she had not engaged in homicidal or other violent behavior and did not attempt or threaten suicide or

otherwise engaged in conduct that demonstrated that she posed a danger to herself  and hence, falsely arresting, imprisoning and taking Wickland to the hospital.

116.   Wickland was aware of her confinement, the defendants intended to confine Wickland, Wickland did not consent to it, and the NYPD Defendants lacked any privilege or right to arrest or imprison Wickland.

117.   The City and Defendant Ruscillo, Longley and Quinn are liable to Wickland for the damages and injuries and loss of liberty that she suffered at Bellevue Hospital because each such defendant knew and should have known that it was likely that Wickland was going to be held by the NYCHHC Defendants against her will for a sustained period of time and that an involuntary admission or forced stay in the psychiatric emergency room at Bellevue Hospital would be emotionally traumatic for anyone.

118.   The other individual defendants who worked at the hotel, including Maldonado and others currently unknown, are jointly liable to Wickland because they directly participated in, encouraged, requested, and suggested the unlawful arrest and detention of Wickland and her removal from the hotel to the hospital.

119.   The City of New York is liable for the conduct of the NPD Police Officers and its EMTs because it is an established practice and policy of the NYPD not to discipline members of the NYPD or FDNY who unlawfully employ their power to declare persons "emotionally disturbed" and that as a result of that practice and policy of not disciplining members of the NYPD or the FDNY for abusing their powers under the Mental Hygiene Law and Patrol Guide 216-05, members of the service, including Defendant Ruscillo, Longley and Quinn, act with impunity.

120.   Upon information and belief, the NYPD does not, or does not adequately,

enforce or discipline violations of the law or Patrol Guide 216-05, governing the proper use of the power to declare a person emotionally disturbed.

121.   Upon information and belief, the NYPD has a practice of resolving EDP calls emanating from the 911 system by placing the burden on the target of the 911 call to prove to responding police officers that the target is not dangerous or in need of emergency medical or psychiatric attention in violation of state law and a person's due process rights to liberty.

122.   Upon information and belief, it is the policy, custom and practice of the NYPD to inadequately discipline its staff, thereby failing to discourage constitutional violations.

123.   As a result of those practices, policies and customs, members of the NYPD, including the individual NYPD defendants in this action, believe that their actions will not be monitored and that their misconduct will not punished because the attitude created by the NYPD fosters and creates an "anything goes" attitude where police officers can arbitrarily deem a person emotionally disturbed without fear or concern that they will be disciplined for such misconduct.

124.   By failing to properly enforce through discipline the rules of law governing when a person can be properly deemed emotionally disturbed, the City of New York has given the members of the service de facto and unduly broad discretion to invoke those powers without any limitations imposed on the arbitrary abuse of that power.

125.   The City of New York is and has been deliberately indifferent to the fact that members of the NYPD routinely misuse their powers under the Mental Hygiene Law and Patrol Guide 216-05, and the City of New York's deliberate indifference in fact caused the false arrest and imprisonment of Wickland.

126.   As a result of the defendants' conduct, each of them are liable to Wickland for

compensatory and punitive damages in an amount to be established as trial under 42 U. S. C. §

1983.

## SECOND CAUSE OF ACTION
### (Section 1983 False Imprisonment and Due Process Violation)

127.   Wickland repeats all the above allegations as if set forth herein at length.

128.   The Defendant Doctors effectuated the involuntary confinement of Wickland

when she did not suffer from mental illness, or pose a danger to herself of others.

129.   The Defendant Doctors effectuated the involuntary confinement of Wickland

pursuant to psychiatric evaluations that failed to comport with accepted medical standards.

130.   The involuntary confinement of Wickland when (1) she did not suffer from

mental illness or pose a danger to herself or others  (2) pursuant to psychiatric evaluations by the

Defendant Doctors independently constitute a violation of the Due Process Clause of the United

Stated Constitution and 42 U.S.C, § 1983 and a Section 1983 False Imprisonment violation.

## THIRD CLAIM FOR RELIEF
### Section 1983 False Imprisonment, Excessive Force, False Imprisonment, Assault and Battery)

131.   Wickland repeats all the above allegations as if set forth herein at length.

132.   NYCHHC, the Doctor Defendants, and John and Jane Roes, are liable to

Wickland for damages under 42 U. S. C. Section 1983 for assault, excessive force, false arrest

and false imprisonment because they held Wickland against her will and without her consent

without excuse, justification or privilege and because they assaulted Wickland and used

excessive and unjustified force against her.

133.   The Doctor Defendants, and John and Jane Roes were at all relevant times acting

as state actors for a public corporation and were acting unlawfully under color of state law.

134.   The Defendant Doctors and John and Jane Roes are liable to Wickland for

assault, battery and excessive force upon Wickland when they attacked Wickland, physically restrained Wickland, and injected her with a sedative against her will and without justification or consent.

135.   At no time was Wickland dangerous to herself or others and no reasonable person could have reached a conclusion that it was likely that Wickland was dangerous to himself or others.

136. At no time did Wickland say anything or do anything that could possibly be rationally understood to suggest that he was dangerous to himself or others.

137.   Wickland never manifested any conduct or spoke any words that suggested that she was dangerous to herself or others.

138.   NYCHHC is liable for the conduct of its individual staff members because it is an established practice and policy of the NYCHHC at Bellevue not to discipline members of its staff who use excessive force or unlawfully employ their power to declare persons "emotionally disturbed" and that as a result of that practice and policy of not disciplining its Bellevue staff for abusing their powers under the Mental Hygiene Law, members of the staff, including the individual defendants act with impunity.

139.   Upon information and belief, NYCHHC does not, or does not adequately enforce violations of the law governing the proper use of force or the power to declare a person emotionally disturbed.

140.   Upon information and belief, it is the policy, custom and practice of the NYCHHC to inadequately discipline its staff, thereby failing to discourage constitutional violations.

141.   As a result of those practices, policies and customs, members of the NYCHHC,

including the individual NYCHHC defendants in this action, believe that their actions will not be monitored and that misconduct will not punished because the attitude created by the NYCHHC fosters and creates an "anything goes" attitude where Bellevue staff members and doctors can use unjustified and excessive force or arbitrarily deem a person emotionally disturbed without fear or concern that they will be disciplined for such misconduct.

142.   By failing to properly enforce through discipline the laws and regulations governing the use of force, the use of sedatives and the involuntary hospitalization of persons alleged to be dangerous, NYCHHC has given its staff and doctors de facto discretion to invoke their powers over patients without any limitations imposed on the arbitrary abuse of that power.

143.   NYCHHC is and has been deliberately indifferent to the fact that members of the NYCHHC routinely misuse their powers.  That deliberate indifference caused the assault and false arrest and imprisonment of Wickland.

144.   As a result, NYCHHC is jointly and severally liable to Wickland under 42 U. S. C. Section 1983 for compensatory and punitive damages caused by their unlawful conduct.

**FOURTH CLAIM FOR RELIEF**
**(Common Law False Arrest and False Imprisonment)**

145.    Wickland repeats all the above allegations as if set forth herein at length.

146.   Defendants, the City of New York, the NYPD John and Jane Does, and John and Jane Does are liable to Wickland for false arrest and false imprisonment under the common law of the State of New York arising from their conduct on February 25, 2021.

147.   Defendants NYCHHC, the Doctor Defendants, and Defendants John and Jane Roes are liable to Wickland for false arrest and false imprisonment under the common law of the State of New York arising from the events that occurred from February 25, 2021 through March 12, 2021.

148.   As a result, said Defendants are liable to Wickland for compensatory and punitive damages in an amount to be established at trial.

### FIFTH CLAIM FOR RELIEF
### (Common Law Assault and Battery)

149.  Wickland repeats all the above allegations as if set forth herein at length.

150.  Defendants, the City of New York, the NYPD John and Jane Does, and John and Jane Does, are liable to Wickland for assault and battery under the common law of the State of New York arising from their conduct on February 25, 2021 because they:  (a) made bodily contact with Wickland, made such contact intentionally, and such contact was offensive in nature; and (b) intentionally placed Wickland in apprehension of imminently harmful or offensive contact.

151.  Defendants NYCHHC, the Doctor Defendants, and Defendants John and Jane Roes, are liable to Wickland for assault and battery under the common law of the State of New York arising from their conduct at Bellevue Hospital from February 25, 2021 through because they:  (a) made bodily contact with Wickland, made such contact intentionally, and such contact was offensive in nature; and (b) intentionally placed Wickland in apprehension of imminently harmful or offensive contact.

152.   As a result, said Defendants are liable to Wickland for compensatory and punitive damages in an amount to be established at trial.

### SIXTH CLAIM FOR RELIEF
### (Common Law Emotional Distress Damages)

153.  Wickland repeats all the above allegations as if set forth herein at length

154.  All the defendants, jointly and separately, are liable to Wickland for intentional, reckless, grossly negligent, and negligent infliction of emotional distress.

155.   The defendants' conduct was extreme and outrageous conduct that was intended to cause Wickland severe emotional distress and did cause him severe emotional distress.

156.   The defendants committed the acts alleged herein maliciously, fraudulently and oppressively with the wrongful intention of injuring Wickland, from an improper motive amounting to malice and in conscious disregard of Wickland's rights, entitling him to recover punitive damages in an amount to be proven at trial.

157.   As a proximate result of the defendants' conduct, Wickland has suffered and continues to suffer extreme emotional distress.

158.   As a result of the defendants' conduct, each of them is jointly and severally liable to Wickland for compensatory and punitive damages caused by their unlawful conduct.

## SEVENTH CLAIM FOR RELIEF
### (Negligent Infliction of Emotional Distress)

159.   Wickland repeats all the above allegations as if set forth herein at length.

160.   All the defendants, jointly and separately are liable to Wickland for negligent infliction of emotional distress.

161.   The individual defendants each owed Wickland a duty to act with reasonable care and the damages and suffering caused to Wickland by the defendants was reasonably foreseeable.

162.   At all relevant times, the defendants had the power, ability, authority and duty to stop the conduct described herein and to intervene to prevent or prohibit such conduct.  Rather than exercise that power, the defendants each acquiesced to the conduct of others that damaged and injured Wickland.

163.   At all relevant times, all the defendants knew, or reasonably should have known, that the conduct described herein would and did proximately result in Wickland's emotional

distress.

164.   Despite said knowledge, power, and duty, the defendants negligently failed to stop engaging in the conduct described herein and negligently failed to prevent or to prohibit such conduct or otherwise to protect Wickland, thereby breaching their duty to him.

165.   The individual defendants unreasonably endangered Wickland's physical safety and caused Wickland to fear for his own safety.

166.   As a result of the defendants' conduct, all of them are jointly and severally liable to Wickland for compensatory and punitive damages in an amount to be established at trial.

**EIGHTH CLAIM FOR RELIEF**
**(Negligent Care and Treatment and Malpractice)**

167.   Wickland repeats all the above allegations as if set forth herein at length.

168.   NYCHHC, the Doctor Defendants, and Defendants John and Jane Roes, jointly and separately, are liable to Wickland for negligence and malpractice in the careless, reckless and improper way that they evaluated and treated Wickland.

169. NYCHHC, the Doctor Defendants, and Defendants John and Jane Roes, owed Wickland a duty of care and they breached that duty, causing Wickland damages.

170.   As a result of the defendants' conduct, each of them is jointly and severally liable to Wickland for damages caused by their unlawful conduct.

**NINTH CLAIM FOR RELIEF**
**(Negligent Staffing, Hiring, Training and Supervision)**

171.    Wickland repeats all the above allegations as if set forth herein at length.

172.   Defendant NYCHHC failed to properly staff and failed to sufficiently staff its psychiatric emergency room, and it negligently selected, hired, trained, retained, assigned and supervised its staff, including the Doctor Defendants, and Defendants John and Jane Roes # 1-

10.

173.  NYCHHC was negligent and careless when it poorly and insufficiently staffed its psychiatric emergency room, and when it selected, hired, trained, retained, assigned, and supervised its staff, including the Doctor Defendants, and Defendants John and Jane Roes.

174.  NYCHHC had the authority to supervise, prohibit, control, and regulate the Doctor Defendants, and Defendants John and Jane Roes so as to prevent these acts and omissions from occurring.

175.  NYCHHC knew or reasonably should have known that unless they properly and sufficiently staffed, supervised, prohibited, controlled, and/or regulated its psychiatric emergency room and the conduct of the Doctor Defendants, and Defendants John and Jane Roes, those individual defendants would perceive their acts and omissions as being ratified and condoned.

176.  NYCHHC failed to exercise due care by failing to properly staff, supervise, prohibit, control, or regulate the Doctor Defendants, and Defendants John and Jane Roes and/or by failing to protect Wickland.

177.  As a direct and proximate result of the Doctor Defendants' and Defendants John and Jane Roes # 1-10's acts and omissions, Wickland has suffered and continues to suffer injuries entitling him to damages in an amount to be determined at trial.

### TENTH  CLAIM FOR RELIEF
### (Negligence – All Defendants)

178.  Wickland repeats all the above allegations as if set forth herein at length.

179.  All the defendants owed Wickland a duty of care and breached that duty by their negligent conduct, which caused Wickland damages in an amount to be established at trial.

WHEREFORE, Plaintiff demands that judgment be entered against each of the

Defendants, jointly and severally, for compensatory damages, for punitive damages, for

reasonable attorneys' fees, expert's fees, costs and expenses of this action pursuant to 42 U. S. C.

§ 1988 together with an order expunging the NYCHHC records containing the false diagnosis of

Plaintiff as having a mental illness and with an award interest thereon as provided by law and

such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  December 1, 2022

*s/Nathaniel B. Smith*
_____
Nathaniel B. Smith
225 Broadway – Suite 1901
New York, NY 10007
212-227-7062
natbsmith@gmail.com

*s/William Brooks*
_____