UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALLISON C. WICKLAND,

                              Plaintiff,

          v.

CITY OF NEW YORK, ET AL.,

                              Defendants.

No. 22-CV-1554 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

        This action arises out of Plaintiff Allison Wickland's forcible removal from a COVID

isolation site run by the City of New York and her subsequent involuntary commitment to Bellevue

Hospital in 2021. Wickland alleges that, while at Bellevue, she was misdiagnosed with

schizophrenia—despite the fact she did not exhibit any behavior that could be viewed as dangerous

to herself or others and lacked a history of mental health issues—and was thus placed in restraints

and administered psychiatric drugs against her will. Plaintiff sues the following Defendants: the

City of New York (the City); Darinka Maldonado, an employee of the Bronx Parent Housing

Network, which served as an agent of the City; New York City Police Department (NYPD)

Officers Cameron Longley and Taylor Ruscillo; New York City Fire Department (FDNY) EMT

Benjamin Quinn; the New York City Health and Hospitals Corporation (NYCHHC), a City-run

public benefits corporation; and the following NYCHHC doctors: Daniel Eckroth, Amany Gala,

Hagop Hajain, Daniel Kestelman, Leo Lopez, Paul Poulakos, and Rachael Johnston Rodriguez,

collectively referred to as "the Doctor Defendants." She also brings claims against unknown

NYPD officers, FDNY EMTs, and NYCHHC employees. Plaintiff alleges, among other things,

false arrest, false imprisonment, excessive force, assault and battery, due process violations, infliction of emotional distress, negligence, and medical malpractice.

Now before the Court are two partial motions to dismiss brought by the NYCHHC and the Doctor Defendants. For the reasons that follow, the motions are granted.

### FACTUAL BACKGROUND[1]

In February 2021, amidst the COVID pandemic, Plaintiff Allison Wickland decided to move out of her mother's house and into affordable housing. *See* SAC ¶ 24. After seeking assistance from the Human Resources Agency, a New York City housing agency, Plaintiff was offered temporary housing in a COVID isolation site at the Holiday Inn in midtown Manhattan. *Id.* ¶¶ 25–27, 30. The City operated the site through agents of Bronx Parent Housing Network, including Site Director Darinka Maldonado. *Id.* ¶ 29.

Plaintiff alleges that when she checked into the Holiday Inn, she was given two options regarding the COVID protocols she would be required to follow. *Id.* ¶ 31. She could either "undergo certain undefined tests to determine whether she had COVID" or she could remain on-site for eleven days and have her temperature and oxygen levels checked every twenty-four hours during that time period. *Id.* Plaintiff chose the latter option, alleging that it "appeared to her to be less intrusive and invasive than the ill-defined COVID-test option." *Id.* ¶ 32. For the next nine days, Plaintiff complied with the COVID protocols. *Id.* ¶ 33.

On February 25, 2021, two on-site staff members went to Plaintiff's door and informed her that she needed "medical clearance" beyond testing her temperature and oxygen levels, and that she would thus be subjected to COVID tests. *Id.* ¶ 35. Opting not to allow the two staff members

---

[1] The facts in this section are taken from the Second Amended Complaint ("SAC" or "the Complaint"), *see* ECF No. 165, and are assumed to be true for purposes of the 12(b)(6) motion, *see Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

2

to enter her room, Plaintiff stepped into the hallway to further converse with them, and attempted to explain that she had previously arranged not to be subjected to COVID tests as a part of her temporary placement at the site. *Id.* ¶¶ 36–37. The staff members allegedly responded "in an increasingly aggressive manner" that she "had no choice" and that they would administer COVID tests "with or without her consent." *Id.* ¶ 38.

At that point, a crowd began to gather in the hallway. *Id.* ¶ 39. Plaintiff says she felt unsafe, so she called 911, asking for police to respond to the scene. *Id.* ¶¶ 39–40. Unbeknownst to her, Defendant Site Director Maldonado also called 911 after learning that Plaintiff had done so, and reported her as an "emotionally disturbed person." *Id.* ¶ 45. Two EMTs from the New York City Fire Department, including Defendant Benjamin Quinn, then arrived. *Id.* ¶ 43. EMT Quinn evaluated Plaintiff, and concluded that she "was fine and did not need further medical attention." *Id.* ¶ 46. Plaintiff, who was fifty-six years old at the time, maintains that she has no history of mental health issues and had never received mental health treatment. *Id.* ¶¶ 22–23. She conveyed that information to EMT Quinn. *Id.* ¶ 47.

Shortly thereafter, two police officers, Defendants Taylor Ruscillo and Cameron Longley, arrived at the scene in response to Site Director Maldonado's 911 call. *Id.* at ¶¶ 48–49. Although EMT Quinn purportedly stated in the presence of Maldonado, Officer Ruscillo, and Officer Longley that Plaintiff did not require further medical attention, Maldonado and other facility staff told Longley that they wanted her taken into custody. *Id.* ¶ 53. Maldonado then allegedly "lured" Plaintiff to the hotel lobby under false pretenses, where Officer Longley, Officer Ruscillo, and EMT Quinn forced her onto a gurney and into an FDNY ambulance against her will and took her to Bellevue Hospital. *Id.* ¶¶ 53–54. Plaintiff insists that at no point did she threaten or attempt to inflict any harm on herself or others. *Id.* ¶¶ 50, 55, 59.

Once Plaintiff arrived at Bellevue, she states that she was "falsely labeled as a 'homeless' street person living in a 'shelter' and was repeatedly diagnosed and re-diagnosed as a dangerous and . . . mentally ill schizophrenic" by the Doctor Defendants. *Id.* ¶ 6. "As a result of the false and groundless diagnosis," Plaintiff was purportedly "physically assaulted," "stripped of her clothing," "placed in physical restraints," "forcibl[y] injected by hypodermic needles[] with unwanted and needless psychiatric drugs," and "held against her will without basis . . . for 15 days." *Id.* ¶ 7. She alleges that, in diagnosing her, each doctor "spent no more than a few minutes evaluating her, if at all." *Id.* ¶ 68. For example, Defendant Poulakos, a doctor of osteopathy, diagnosed Plaintiff as having a mental illness, determining that she was a danger to herself and in need of emergency attention after just a few minutes of observation and without conducting any tests. *Id.* ¶¶ 69–70. Doctor Poulakos then authorized Plaintiff's involuntary admission to the inpatient unit, finding that she was "mentally ill and dangerous on the ground that she was 'evasive' and 'confrontational,' and purportedly had recently suffered from psychosis." *Id.* ¶ 73. Once admitted to Bellevue, Plaintiff was housed in a psychiatric emergency room. *Id.* ¶ 79. Defendant Gala, another doctor, spent no more than a few minutes with Plaintiff before relying on Poulakos' evaluation to certify Plaintiff for confinement. *Id.* ¶ 81. The next day, a staff member contacted Plaintiff's family to learn more about her mental health history. *Id.* ¶ 83. Plaintiff's sister allegedly informed the staff member that Plaintiff had no history of mental illness, but Plaintiff asserts that the staff member did not "carefully record" that information. *Id.* ¶¶ 84–86.

According to Plaintiff, on several occasions while in Bellevue, the staff, including Defendant Doctor Eckroth and the other Doctor Defendants, "directed and authorized hospital staff to place [Plaintiff] in physical restraints and ordered that [she] be given antipsychotic medication and other sedatives against [her] will," *id.* ¶¶ 87–88, over her repeated objections that she did not

want medication or sedatives for any reason, *id.* ¶ 93. Plaintiff estimated that she was forcibly injected with medication six to eight times while at Bellevue. *Id.* ¶ 95. Sometimes, the medication left her "unconscious for hours or for days." *Id.* ¶ 94. The first time Plaintiff was forcibly medicated, she woke up approximately two days later and discovered that someone had removed her clothing and dressed her in a hospital gown while she was unconscious. *Id.* ¶ 96. The medication caused Plaintiff's arms and hands to move uncontrollably, and also caused her to bleed. *Id.* ¶ 122. The Doctor Defendants, however, "concluded that the[se] . . . erratic movements were caused by [Plaintiff's] purported mental illness, not the sedatives and medications forced upon [her]." *Id.* ¶ 123.

About two days after her admittance to Bellevue, Defendant Hajain, also a doctor, authorized Plaintiff's continued involuntary confinement, even though she "had done absolutely nothing at the hospital (or elsewhere) that would suggest to Defendant [Hajain] or a reasonable person or a reasonable doctor that she was dangerous, mentally ill, or in need of emergency medical or psychiatric attention." *Id.* ¶ 99; *see id.* ¶ 98. Meanwhile, Plaintiff's treating physician at Bellevue, Defendant Rodriguez, continued to authorize Plaintiff's hospitalization on the ground that "she was a danger to others and lacked the ability to meet her basic needs in the community"— without evaluating any "risk factors empirically related to harm-causing behavior," such as "a history of violence, a lack of impulse control in a way that results in harm-causing behavior, and certain symptoms of major mental illness such as an intent to act harmfully on paranoia." *Id.* ¶¶ 102–06. About five days after Plaintiff's confinement, Rodriguez diagnosed Plaintiff with schizophrenia, although she purportedly had no grounds for this diagnosis. *Id.* ¶¶ 107, 110–11.

Defendant Kestelman, another doctor working at Bellevue, authorized Plaintiff's involuntary hospitalization for up to sixty days, pending a hearing. *Id.* ¶¶ 107, 110. Yet another

Doctor, Defendant Lopez, then took steps to implement Plaintiff's sixty-day hospitalization, together with other unknown staff who facilitated her continued confinement. *Id.* ¶¶ 114–15.

On March 9, 2021, Plaintiff requested in writing to be released. *Id.* ¶ 116. On March 12, 2021, Justice Phillip Hom of the New York Supreme Court for New York County held a hearing on Defendant Doctors Rodriguez's and Kestelman's application to involuntarily confine Plaintiff for sixty days. *Id.* ¶ 117. At the hearing, Doctor Rodriguez allegedly "admitted" that she lacked a sufficient basis to confine Plaintiff against her will and that she could not justify Plaintiff's prior involuntary commitment. *Id.* ¶ 119. At the conclusion of the hearing, Justice Hom found that Doctors Rodriguez and Kestelman had failed to show that Plaintiff was mentally ill or dangerous, and ordered her release. *Id.* ¶ 118.

## PROCEDURAL BACKGROUND

Plaintiff initiated this lawsuit on February 24, 2022. *See* ECF No. 1. Plaintiff filed the Second Amended Complaint on September 12, 2023. *See* ECF No. 165.[2] She raises eleven causes of action pursuant to 42 U.S.C. § 1983 and under state law, including false arrest, false imprisonment, excessive force, due process violations, assault and battery, infliction of emotional distress, negligence, and medical malpractice. *See id.* On September 26, 2023, the COVID isolation Site Director Maldonado filed an answer, as did Defendants City of New York, Officer Ruscillo, Officer Longley, and EMT Quinn on December 1, 2023. *See* ECF Nos. 172, 178. On December 21, 2023, Defendant Doctor Kestelman filed a partial motion to dismiss the Complaint for failure to state a claim. *See* ECF Nos. 179, 181. And on December 22, 2023, Defendant Doctors Eckroth, Gala, Hajain, Lopez, Poulakos, Rodriguez and the NYCHHC similarly filed a partial

---

[2] Although Plaintiff had not properly sought leave to amend before filing the Second Amended Complaint, on November 1, 2023, Magistrate Judge Wang granted her request to file it nunc pro tunc. *See* ECF No. 175.

motion to dismiss the Complaint, this one pursuant to Federal Rule of Civil Procedure 12(b)(2), 12(b)(5), and 12(b)(6). *See* ECF Nos. 182, 184.

## LEGAL STANDARD

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "[B]ecause a motion to dismiss for lack of personal jurisdiction is inherently a matter requiring the resolution of factual issues outside of the pleadings, all pertinent documentation submitted by the parties may be considered in deciding the motion." *Holzman v. Guoqiang Xin*, No. 12-cv-8405, 2015 WL 5544357, at *4 (S.D.N.Y. Sept. 18, 2015). "Where . . . a district court relies on the pleadings and affidavits . . . plaintiffs need only make a prima facie showing of personal jurisdiction over the defendant." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008). The Court must "construe the pleadings and affidavits in the light most favorable to [the] plaintiff[], resolving all doubts in [her] favor," *id.*, and it must accept "the allegations in the complaint . . . as true to the extent they are uncontroverted by the defendant's affidavits, which the district court may also consider," *GlaxoSmithKline LLC v. Laclede, Inc.*, No. 18-cv-4945, 2019 WL 293329, at *3 (S.D.N.Y. Jan. 23, 2019). The Court may not, however, "draw argumentative inferences in the plaintiff's favor" or "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).

"When a defendant moves to dismiss under Rule 12(b)(5), the plaintiff bears the burden of proving adequate service." *Dickerson v. Napolitano*, 604 F.3d 732, 752 (2d Cir. 2010). "In considering a motion to dismiss pursuant to Rule 12(b)(5), the Court may look beyond the

pleadings, including to affidavits and supporting materials, to determine whether service was proper." *Vega v. Hastens Beds, Inc.*, 339 F.R.D. 210, 215 (S.D.N.Y. 2021).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To plead a plausible claim, a plaintiff need not show the alleged misconduct was probable, but he must show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Pleading "facts that are 'merely consistent with' a defendant's liability, . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In determining whether a plaintiff's complaint is "sufficient to cross the federal court's threshold," *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011), a court must "accept[ ] all factual allegations as true, but giv[e] no effect to legal conclusions couched as factual allegations." *Stadnick*, 861 F.3d at 35.[3]

## DISCUSSION

### I. The Complaint Is Dismissed Against Defendant Poulakos Due to Lack of Personal Jurisdiction.

Defendant Poulakos moves to dismiss all claims against him on the ground that the Court lacks personal jurisdiction over him because he was never served in accordance with Federal Rule of Civil Procedure 4(e) or New York State law. *See* Fed. R. Civ. P. 12(b)(2), (b)(5). Plaintiff asserts that the Court has personal jurisdiction over Doctor Poulakos because she served him at his place

---

[3] Defendant Kestelman titled his motion as a "motion to dismiss" but he cites the standard of review for motions made under Federal Rule of Civil Procedure 12(c), which governs judgment on the pleadings. In any event, "[t]he standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021).

of business, where the summons and complaint were accepted by his purported "coworker," Allison Rothman, on his behalf. *See* Opp'n at 3; ECF No. 111, Ex. 2. Plaintiff asserts that Rothman "obviously was another medical professional who shared space in the same medical suite as Poulakos," making her a "person of suitable age and discretion for the purpose of accepting service," whether or not he "ha[d] a relationship with [her]." Opp'n at 3. According to an affidavit submitted by Doctor Poulakos, however, he maintained a psychiatric office at the address listed in Plaintiff's affidavit of service, where he had exclusive occupancy. See ECF No. 116, Ex. M at ¶ 4. Doctor Poulakos stated that Rothman was neither his coworker nor a sublessee of his office space, and that he did not know her at all. *Id.* at ¶¶ 4–5. He argues that delivery of the summons and complaint upon Rothman was thus insufficient to render him served, and that because he was not served, the Court lacks personal jurisdiction.

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) (quoting *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)). A Court's analysis under Federal Rules of Civil Procedure 12(b)(2) and (5) "collapses into one: if service of process over Defendants is insufficient, then the Court may not exercise proper jurisdiction over them." *Pruthi v. Empire City Casino*, No. 18-cv-10290, 2022 WL 596370, at *4 (S.D.N.Y. Feb. 28, 2022); *see also Agapov v. UBIF Franchising Co.*, No. 23-cv-02178, 2024 WL 1018453, at *3 (S.D.N.Y. Mar. 8, 2024).

Federal Rule of Civil Procedure 4(e) provides that service of the summons and complaint is proper if it is made in accordance with "state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1). Under New York law, service may be made by delivery "within

the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons . . . to the person to be served at his or her actual place of business." N.Y. C.P.L.R. § 308(2).

Defendants claim that service to Allison Rothman was improper under both federal and state law because she was not a person of "suitable age and discretion," and was instead "entirely unknown to Dr. Poulakos and did not have access to" his suite. NYCHHC, et al. Mot. to Dismiss at 8–9. "At best," Defendants assert "plaintiff's process server encountered a neighbor of Dr. Poulakos, assumed she was a coworker[,] and delivered the summons and complaint to her." *Id.* at 9. Defendants further argue that "service upon a co-tenant in common area is not proper service." *Id.* at 10. Plaintiff responds that service was proper because "the papers were delivered to the medical office he was using at the time" and that "the affidavit of service identifies . . . Rothman as a coworker[,] who obviously was another medical professional who shared space in the same medical suite as Poulakos." Opp'n at 3. Service on a co-tenant is proper, Plaintiff argues, regardless of whether there is a relationship between the "target of the process and the person served." *Id.*[4]

The Court agrees with Defendant Poulakos. It is a plaintiff's burden to show that there is personal jurisdiction over a defendant. *See Pruthi*, 2022 WL 596370, at *4. In his affidavit,

---

[4] Plaintiff also argues that Doctor Poulakos waived the defense of lack of personal jurisdiction because he did not include it in his motion to dismiss the initial complaint and instead merely argued that service was insufficient. *See* Opp'n at 2–3. "[A]n amended complaint does not automatically revive all of the defenses and objections that a defendant has waived in response to the original complaint," especially those that "involve the core issue of a party's willingness to submit a dispute to judicial resolution, such as lack of personal jurisdiction." *Carroll v. Trump*, 88 F.4th 418, 432 (2d Cir. 2023). However, "waiver may not be proper where the defense is raised at the first pragmatically possible time and applying it at that time would not unfairly prejudice the opposing party." *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 910 (2d Cir. 1998); *cf. Carroll*, 88 F.4th at 432–33 (holding that the defendant had not identified any changes since the filing of the original complaint that would have made him unable to plead a presidential immunity defense in his answer to that complaint). Here, Doctor Poulakos raised the defense of lack of personal jurisdiction at the first time practicable. Plaintiff had not filed her process server's affidavit of service on Poulakos until after Defendants filed their motion to dismiss her initial complaint. *See* ECF No. 111, Ex. 2. Accordingly, Doctor Poulakos had not learned the specifics of whom the summons and complaint had been left with

Poulakos swore that he has "never known an Allison Rothman and first learned of the name when [his] attorney notified [him] of plaintiff's assertion that the summons and complaint were delivered to her"; that Rothman "is not [his] employee or [his] coworker"; and that he has "no relationship with her whatsoever and [is] unaware regarding any dealings she may have had in the vicinity of [his] office." *See* ECF No. 116, Ex. M at ¶ 5. Because "[s]ubstituted service to a person of suitable age and discretion at a defendant's actual place of business presume[s] that the business relationship between the deliveree and the defendant will induce the prompt redelivery of the summons to the defendant," such "service would be reasonably calculated to apprise [the defendant] of the pendency of th[e] action and afford him an opportunity to present objections." *Ascencio-Sutphen v. McDonald's Corp.*, 838 N.Y.S.2d 403, 407 (N.Y. Sup. Ct. 2007). Although the "duty or obligation" of redelivery is "integral in an employer/employee relationship," "[t]his dynamic is not present" in other types of relationships, where the "presumption of redelivery" is instead "merely a hope or a wish of accomplishment." *Id.* (holding that delivery to a defendant's independent contractor does not satisfy N.Y. C.P.L.R. § 308(2)). The presumption of redelivery does not apply here.

Plaintiff states, without support, that Rothman "obviously was another medical professional who shared space in the same medical suite as Poulakos," Opp'n at 3—a fact controverted by Poulakos' affidavit, *see GlaxoSmithKline LLC*, 2019 WL 293329, at *3. Because Plaintiff has not met her burden of showing that Rothman was Doctor Poulakos' co-worker, the Court cannot presume that she would redeliver the summons and complaint to him. And even if the Court were to assume that Rothman identified herself as Doctor Poulakos' co-worker, a

---

until that point. *See* ECF No. 116, Ex. M at ¶¶ 2, 5. Doctor Poulakos, thus, did not waive or forfeit his defense of personal jurisdiction.

"process server's reliance on representations from [a] defendant's former employee or colleague that he/she was authorized to accept service for [the] defendant does not obviate [a] plaintiff's burden to prove that service was made to [the] defendant's actual place of business." *Borges v. Entra Am., Inc.*, 801 N.Y.S.2d 230, at *2 (N.Y. Civ. Ct. 2005).

Plaintiff relies on cases outside of the business context where service was deemed proper on a co-tenant or neighbor. *See* Opp'n at 3. Though there is, as Plaintiff points out, some case law standing for the proposition that delivery of a summons and complaint upon someone else at a defendants' residence is a proper form of service, *see id.* (citing cases), the New York Court of Appeals has clarified that such service is proper only where "repeated efforts at service" had been made, *Biological Concepts, Inc. v. Rudel*, 558 N.Y.S.2d 312, 313 (N.Y. App. Div. 1990); *see F. I. duPont, Glore Forgan & Co. v. Chen*, 41 N.Y.2d 794, 796–97 (N.Y. 1977) (stating that service upon a defendant's doorman was proper after the service processor had made several attempts to serve defendant at his residence, the doorman restricted access to the defendant's actual apartment, and the doorman was found to be a "responsible communicator" whose job was to accept and deliver correspondence on behalf of the defendant). Here, Plaintiff has not shown that the process server made repeated attempts to deliver the summons and complaint, that access to Doctor Poulakos' particular suite was blocked, or that Doctor Poulakos and Rothman had a preexisting relationship. *See Biological Concepts, Inc.*, 558 N.Y.S.2d at 313; *see also Fam. Fin. Corp. v. Canuelas*, 94 Misc. 2d 241, 242 (N.Y. Civ. Ct. 1978) (distinguishing improper service on a defendant's co-tenant from the facts in *F.I. dupont, Glore Forgan & Co. v. Chen*); *Matter of Pickman Brokerage, Nordman Apartment Co. & Morton Pickman (Bevona)*, 584 N.Y.S.2d 807,

807 (N.Y. App. Div. 1992) (holding that a building porter not in the defendant's employ was not a person of suitable age and discretion pursuant to N.Y. C.P.L.R. § 308(2)).

As to prejudice, a "plaintiff's contention that [the] defendant has not been prejudiced, and therefore service should be upheld," does not support a finding of proper service. *Macchia v. Russo*, 67 N.Y.2d 592, 595 (N.Y. 1986). Even if Plaintiff had established that Doctor Poulakos "received prompt notice of the action," that "is of no moment" because "[n]otice received by means other than those authorized by statute does not bring a defendant within the jurisdiction of the court." *Id.* Accordingly, the Court dismisses the claims against Defendant Poulakos for lack of personal jurisdiction as Plaintiff has not properly served him. *See* Fed. R. Civ. P. 12(b)(2), (5).[5]

## II. Plaintiff's First Cause of Action Is Dismissed Against the Doctor Defendants and the NYCHHC.

Plaintiff's first cause of action does not include any allegations against the Doctor Defendants or the NYCHHC. The conduct Plaintiff alleges to support this claim involves the initial placement of Plaintiff in custody and her transport to Bellevue—events that took place before she interacted with the Doctor Defendants and the NYCHHC. *See* SAC ¶¶ 133–52.[6] Therefore, to the extent that Plaintiff brings her first cause of action against the Doctor Defendants and the NYCHHC, the Court grants their motions to dismiss this count against them.

## III. Plaintiff's Second Cause of Action Is Dismissed Against the NYCHHC.

Plaintiff's second cause of action seeks redress pursuant to § 1983 for false imprisonment and violation of her due process rights. *See* SAC ¶¶ 153–56. Her claim arises from the Doctor

---

[5] Because the Court finds that Plaintiff has not properly served Doctor Poulakos, it need not consider her application to extend nunc pro tunc for good cause the deadline for her delivery of the summons and complaint upon Rothman—which occurred almost five months after the deadline for service.

[6] Furthermore, as Defendants point out, "Plaintiff does not contest that her first cause of action . . . must be dismissed as against the medical defendants because it does not include any allegations against them." NYCHHC, et al. Reply at 9.

Defendants' efforts to involuntarily commit her based on "psychiatric evaluations that failed to comport with accepted medical standards." *Id.* ¶¶ 154–56. Although the cause of action references the Doctor Defendants, it does not mention the NYCHHC at all. In her opposition to the motion to dismiss, moreover, Plaintiff failed to advocate for the NYCHHC's liability for this cause of action. Accordingly, the Court grants the NYCHHC's motion to dismiss Plaintiff's second cause of action against it for failure to state a claim.

## IV.    Plaintiff's Third Cause of Action Is Dismissed Against the NYCHHC.

Plaintiff's third cause of action seeks redress pursuant to § 1983 for false imprisonment, excessive force, and assault and battery in violation of her due process rights against the Doctor Defendants. *Id.* ¶¶ 157–71. She brings this claim based on their use of restraints and forcible injection of medication and sedatives. With respect to the NYCHHC, Plaintiff alleges that it has a policy, custom, and practice of "inadequately disciplin[ing] its staff," leading them to believe that "their actions will not be monitored and that misconduct will not [be] punished," as well as that the NYCHHC is "deliberately indifferent to the fact that [its] members routinely misuse their powers." *Id.* ¶¶ 165–68, 170. She also alleges that the NYCHHC has a custom and practice of unnecessarily placing patients in restraints while they are forcibly administered medication. *Id.* ¶¶ 166, 169. Plaintiff asserts that the "NYCHHC is liable for the conduct of its individual staff members" due to these policies. *Id.* ¶ 164.

"The [NYCHHC] is a public benefit corporation created to provide health and medical services to New York City residents pursuant to the New York City Health and Hospitals Corporation Act," and therefore, its "liability under § 1983 is governed by the principles set forth in *Monell v. Department of Social Services* and its progeny." *Simpkins v. Bellevue Hosp.*, 832 F. Supp. 69, 73 (S.D.N.Y. 1993). Pursuant to *Monell*, "[t]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements:

14

(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). "*Monell* expressly prohibits *respondeat superior* liability for municipalities, . . . meaning that a plaintiff must demonstrate that through its *deliberate* conduct, the municipality was the moving force behind the injury alleged." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97–98 (2d Cir. 2020). "[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) (plurality opinion).

A plaintiff may demonstrate that a policy or custom exists by (1) "provid[ing] evidence of a formal policy officially adopted by the municipality," *Castilla v. City of New York*, No. 09-cv-5446, 2012 WL 3871517, at *3 (S.D.N.Y. Sept. 6, 2012) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)); (2) for "a single unconstitutional act or decision," demonstrating that it was "taken by an authorized decision-maker," *id.* (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404–06 (1997)); (3) "by showing that the acts of [a] municipal agent were part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware," *id.* (citing *Brown*, 520 U.S. at 403–04); or (4) by showing that a "municipality's failure to provide adequate training or supervision of its agents rises to the level of deliberate indifference," *id.* (citing *Brown*, 520 U.S. at 407).

Plaintiff appears to allege two unconstitutional policies under the third cause of action: NYCHHC's policy of "failing to properly enforce through discipline" "violations of the law governing the proper use of force or the power to declare a person emotionally disturbed," SAC ¶¶ 164, 165–66, 168, and its "custom and practice of . . . plac[ing] patients in restraint[s] at the same time it forcibly administers both antipsychotic medication and less potent sedatives when it

15

is necessary to administer only a sedative to accomplish the hospital's goal," *id.* ¶ 166; *see id.* ¶ 169.

As to NYCHHC's alleged liability for failing to discipline its staff, the Second Circuit has "held that municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). "Such inaction rises to the level of a municipal policy 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" *Boddie v. City of New York*, No. 15-cv-4275, 2016 WL 1466555, at *3 (S.D.N.Y. Apr. 13, 2016) (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)). To demonstrate deliberate indifference, a plaintiff must show that the following "requirements" are "met": first, "that defendants knew to a moral certainty that the City would confront a given situation"; second, that "the situation presented the City with a difficult choice or there was a history of its mishandling the situation"; and third, that "the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights." *Reynolds*, 506 F.3d at 192 (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)). "Implicit" in the second requirement is a showing "that a municipal actor must have disregarded a *known* or *obvious* consequence of their inaction." *Pettiford v. City of Yonkers*, No. 14-cv-6271, 2021 WL 2556172, at *6 (S.D.N.Y. June 21, 2021).

Without pleading any specific facts in support, Plaintiff alleges that "as a result of [the NYCHHC's] practices, policies[,] and customs, members of the NYCHHC, including the individual NYCHHC defendants in this action, believe that their actions will not be monitored and that misconduct will not [be] punished because the attitude created by the NYCHHC fosters and

creates an 'anything goes' attitude." SAC ¶ 167. The result, according to Plaintiff, is that "Bellevue staff members and doctors can use unjustified and excessive force or arbitrarily deem a person emotionally disturbed without fear or concern that they will be disciplined." *Id.* These allegations, however, "are precisely the types of conclusory allegation[s] that, without factual support, must be dismissed." *Boddie*, 2016 WL 1466555, at *3 (so holding where the plaintiff alleged that a police department's "failure to discipline its officers that use excessive force emboldened [officers] to use unreasonable and excessive force against him" and that the city was aware of such use of force). Furthermore, "[a] pattern of similar constitutional violations by . . . employees is ordinarily necessary to demonstrate deliberate indifference," *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (so holding in the failure to train context),[7] and Plaintiff alleges no other instances of misconduct that could establish such a pattern.[8]

As to Plaintiff's claim that the NYCHHC had a custom and practice of placing patients in restraints and administering them unnecessary medications, Plaintiff again fails to allege that that there is "any formal [NYC]HHC policy or persistent practices." *Mejía v. N.Y.C. Health & Hosps. Corp.*, No. 16-cv-9706, 2018 WL 3442977, at *12 (S.D.N.Y. July 17, 2018). She also fails to suggest that any of the Doctor Defendants "had the authority to establish hospital policy or to determine what procedures were to be used in admitting, treating, and discharging involuntarily

---

[7] Plaintiff, relying on a case predating *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), argues that the Court should employ a relaxed pleading standard because it is "unlikely that a plaintiff would have information about [a] city's programs or about the cause of the misconduct at the pleading stage." Opp'n at 7 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004)). The Second Circuit, however, has held that although "§ 1983 plaintiffs cannot be expected to know the details of a municipality's" policies "prior to discovery," they are "not relieve[d] . . . of their obligation under *Iqbal* to plead a facially plausible claim." *Simms v. City of New York*, 480 F. App'x 627, 631 n.4 (2d Cir. 2012). "For example, plaintiffs can meet their pleading obligations in this respect by alleging facts indicating '[a] pattern of similar constitutional violations by untrained [municipal] employees.'" *Id.* (quoting *Connick*, 563 U.S. at 63).

[8] While there is "the possibility that, in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference," the facts here do not fall within such an exception. *Id.* at 63 (citing *Bd. of Cnty. Comm'rs of Bryant Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

committed patients," or that they "had any authority beyond the discretionary authority that is normally afforded physicians in their treatment of patients." *Mejía*, 2018 WL 3442977, at \*14; *see id.* at \*13 (holding that the plaintiff "fail[ed] to state a *Monell* claim based on a single act of a final policymaker" where he alleged that a NYCHHC doctor violated his due process rights).

Nor does Plaintiff plausibly allege that the use of restraints while administering medication and the use of more potent drugs than necessary were widespread customs of which policymakers at the NYCHHC must have been aware. To the contrary, Plaintiff merely asserts that "[i]n numerous instances[,] pursuant to orders written by [the] Defendant Doctors[,] hospital staff attempted to control [her] by placing [her] in restraints and forcibly administering medication when it was unnecessary to do both to accomplish the hospital's goal." SAC ¶ 89; *see also* SAC ¶¶ 90–92, 95. Plaintiff cites no instances of other individuals being unnecessarily restrained or given antipsychotic drugs. For the reasons stated above, her allegations are insufficient to mount a *Monell* claim that the NYCHHC had a policy and custom of unnecessarily restraining and over-medicating its patients.

Accordingly, the Court grants the NYCHHC's motion to dismiss Plaintiff's third cause of action against it.

## V.    Plaintiff's Sixth and Seventh Causes of Action Are Dismissed Against the Doctor Defendants and the NYCHHC.

In her sixth and seventh causes of action, respectively, Plaintiff alleges that Defendants are liable for intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED). SAC ¶¶ 181–94. She broadly alleges that Defendants engaged in "extreme and outrageous conduct" and failed to fulfill their duties to "act with reasonable care." *Id.* ¶¶ 183, 189. Defendants argue that these causes of action must be dismissed on the ground that IIED and NIED are claims that may only be brought when the conduct alleged does not fall within the ambit of a

18

traditional tort cause of action and that, here, the same alleged conduct underlies Plaintiff's claims for false arrest, medical malpractice, and assault and battery. Defendants additionally argue that the sixth cause of action must be dismissed against the NYCHHC because government entities cannot be sued for IIED.

The Court agrees with Defendants. "New York does not recognize NIED or IIED causes of action where the conduct underlying them may be addressed through traditional tort remedies." *Berrio v. City of New York*, No. 15-cv-09570, 2017 WL 118024, at *7 (S.D.N.Y. Jan. 10, 2017); *see also Salmon v. Blesser*, 802 F.3d 249, 257 (2d Cir. 2015) (noting that "[a]ll four Appellate Division courts have answered the question" of "whether an intentional infliction claim can ever be brought where the challenged conduct falls well within the ambit of other traditional tort liability" and have "held it cannot"); *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 364 (S.D.N.Y. 2021) ("A NIED claim cannot be asserted if it is essentially duplicative of tort or contract causes of action."). A plaintiff in a similar case, *Vivar v. City of New York*, No. 18-cv-5987, 2020 WL 1505654 (S.D.N.Y. Mar. 30, 2020), also brought claims against an individual doctor and a hospital after he was involuntarily committed and administered an antipsychotic medication without receiving an independent medical examination. *Id.* at *3. As here, the plaintiff in *Vivar* brought state-law claims against the defendants for false imprisonment, medical malpractice, assault, battery, IIED, and NIED. *Id.* at *13. The court dismissed the IIED and NIED claims, holding that the plaintiff had "alleged no conduct . . . that does not fall within the ambit of traditional tort law—namely, false arrest, medical malpractice, assault, and battery." *Id.* The same is true here. As in *Vivar*, the Court identifies no conduct alleged in the Complaint with respect to the claims for IIED and NIED that is not also encompassed by Plaintiff's other traditional tort claims.

The Court further rejects Plaintiff's argument that it is "premature" to dismiss her IIED and NIED claims as duplicative because Federal Rule of Civil Procedure 8(d)(2) allows for alternative pleadings. Opp'n at 9–11. Plaintiff cites *Henry v. Daytop Village, Inc.*, 42 F.3d 89, 95 (2d Cir. 1994), to support her argument. Although *Henry* recognized that courts may "entertain" multiple, inconsistent claims, *id.* at 95–96, Plaintiff conflates the ability to bring inconsistent claims with the ability to bring duplicative ones. Defendants' argument does not rest on the fact that Plaintiff's IIED and NIED claims are inconsistent, but rather that they are duplicative of her false arrest, medical malpractice, and assault and battery claims. Courts in this circuit have rejected arguments that Rule 8(d)(2) permits IIED and NIED claims to be used as substitutes for available, traditional tort theories where the plaintiff "has not articulated . . . any conduct that is not already the subject of other claims." *Powell v. City of Jamestown*, No. 21-cv-721, 2022 WL 1913581, at *21 (W.D.N.Y. June 3, 2022); *see also Vivar v. Apple Inc.*, No. 22-cv-347, 2023 WL 3847163, at *4 (S.D.N.Y. June 6, 2023).

As Defendants rightly argue, and Plaintiff does not contest, it is further "well settled that public policy bars claims sounding in [IIED] against a governmental entity." *Lauer v. City of New York*, 659 N.Y.S.2d 57, 58 (N.Y. App. Div. 1997) (collecting cases); *see also Noonan v. City of New York*, No. 14-cv-4084, 2015 WL 3948836, at *7 (S.D.N.Y. June 26, 2015); *J.H. v. Bratton*, 248 F. Supp. 3d 401, 416 n.10 (E.D.N.Y. 2017).

In any event, Plaintiff's sixth and seventh causes of action are also dismissed against the Doctor Defendants and the NYCHHC for failure to state a claim because she merely asserts legal conclusions to support these claims. *See Stadnick*, 861 F.3d at 35.

Accordingly, the Court grants the Doctor Defendants' and the NYCHHC's motions to dismiss Plaintiff's sixth and seventh causes of action against them.

**VI.    Plaintiff's Claims for Negligence In Her Eighth and Tenth Causes of Action Are Dismissed Against the Doctor Defendants and the NYCHHC.**

Plaintiff's eighth cause of action is for both "negligent care and treatment" and "malpractice," SAC at 33; *see id.* ¶¶ 195–98, and her tenth cause of action is for "negligence," *id.* at 34; *see id.* ¶¶ 208–09. In her eighth cause of action, Plaintiff alleges that the Doctor Defendants and the NYCHHC "are liable . . . for negligence and malpractice in the careless, reckless, and improper way that they evaluated and treated [her]," and that they breached their duty of care to her. *Id.* ¶¶ 197–98. Her tenth cause of action asserts that "[a]ll the defendants owed [her] a duty of care and breached that duty by their negligent conduct, which caused [her] damages." *Id.* ¶ 209.

The Court agrees with Defendants that the eighth and tenth causes of action for negligence sound in medical malpractice. Although the New York Court of Appeals has "note[d] that the distinction between medical malpractice and negligence is a subtle one," it has also recognized that a "claim sounds in medical malpractice when the challenged conduct constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician." *Weiner v. Lenox Hill Hosp.*, 88 N.Y.2d 784, 787–88 (N.Y. 1996); *see also Stanley v. Lebetkin*, 507 N.Y.S.2d 468, 468 (N.Y. 1986) ("When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence."). "By contrast, when the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but the hospital's failure in fulfilling a different duty, the claim sounds in negligence." *Weiner*, 88 N.Y.2d at 788.

Plaintiff does not allege any facts to suggest that her negligence claims arising from the Doctor Defendants' conduct sound in anything but medical malpractice. Tellingly, her claim under the eighth cause of action is specifically for "negligent care and treatment." SAC at 33; *see id.* ¶ 196. And while the Complaint does not specify the conduct upon which Plaintiff's tenth cause

of action is based, her opposition brief does not point the Court to any allegations of misconduct that would fall outside the scope of the Doctor Defendants' provision of her care and treatment. Additionally, Plaintiff alleges that during her time at Bellevue the Doctor Defendants either failed to medically evaluate her or only spent a few minutes doing so, *see id.* ¶¶ 68–70, 81; unnecessarily used restraints to medicate her, *see id.* ¶¶ 88–92; unnecessarily prescribed her antipsychotic medication and forcibly medicated her, *see id.* ¶¶ 87, 89–96, 120–24; incorrectly diagnosed her with a mental illness, *see id.* ¶¶ 69, 82, 110–13, 123; did not "attempt to establish [her] trust," *see id.* ¶¶ 72–73, 77; and involuntarily committed her based on assumptions despite her lack of history with mental health issues and calm demeanor, due to the misguided belief "that she was a mentally ill, homeless, black, and impoverish[ed] street person." *Id.* ¶ 76; *see id.* ¶¶ 71, 73–74, 77–78, 81–82, 84, 98–100, 103, 106–09, 114–15, 118–21.

The misconduct Plaintiff alleges thus constitutes essential components of the "physician-patient relationship," *Stanley* 507 N.Y.S.2d at 468, because it relates to the Doctor Defendants' medical examination, diagnosis, and treatment of Plaintiff, *see Weiner*, 88 N.Y.2d at 916 (explaining that where a defendant's conduct "implicate[s] questions of medical competence or judgment linked to the treatment of [a patient]," the claim sounds in medical malpractice); *see also La Russo v. St. George's Univ. Sch. of Med.*, 747 F.3d 90, 101 (2d Cir. 2014) (holding that allegations that defendants negligently "fail[ed] to provide [a plaintiff] with proper psychiatric care" are "substantially related to medical treatment and as such, are duplicative of the medical malpractice claims"). Furthermore, New York State courts have held that "determining the need for restraints . . . sounds in medical practice." *Jeter v. N.Y. Presbyterian Hosp.*, 101 N.Y.S.3d 411, 413 (N.Y. App. Div. 2019); *see also Berger v. State*, 567 N.Y.S.2d 275, 279 (N.Y. App. Div. 1991) (holding that the "crux" of a plaintiff's claim for negligence based on her placement in restraints

while she went through withdrawal from prescription medication was "actually medical malpractice"). The Appellate Division, Second Department, has also held that allegations that a defendant "failed to properly screen the plaintiff for health problems, obtain her medical history, monitor her physical condition," provide her with tests, and observe her are related to the "rendition of medical treatment," and sound in medical malpractice, not negligence. *Rabinovich v. Maimonides Med. Ctr.*, 113 N.Y.S.3d 198, 203 (N.Y. App. Div. 2019).

Plaintiff's claims for negligent care and treatment asserted against the NYCHHC fail for the same reasons. While "[a] hospital . . . has a general duty to exercise reasonable care and diligence in safeguarding a patient," "when the complaint challenges the medical facility's performance of functions that are an integral part of the process of rendering medical treatment and diagnosis to a patient, such as taking a medical history and determining the need for restraints, it sounds in medical malpractice." *Jeter*, 101 N.Y.S.3d at 413; *see also La Russo*, 747 F.3d at 101 (dismissing a plaintiff's negligence claim against a medical school on the ground that the claim is actually for medical malpractice).

The facts here are not akin to cases in which New York State courts have held that a patient's claims properly sounded in negligence. Negligence claims must involve conduct that does not "call[] into question the competency of . . . medical decisions made regarding [the plaintiff's] treatment." *Sweeney v. Presbyterian/Columbia Presbyterian Med. Ctr.*, 763 F. Supp. 50, 52 (S.D.N.Y. 1991) (holding that a claim "challeng[ing] the competency of the hospital as a supplier of . . . blood" was a claim for negligence). The cases on which Plaintiff relies are also inapposite to her claims for negligent care and treatment. In *Huntley v. State of New York*, 62 N.Y.2d 134, 137 (N.Y. 1984), for example, the New York Court of Appeals held that the defendant "failed in its duty to supervise its [psychiatric] patient adequately," where a staff member did not inform the

on-duty psychiatrist that the patient had communicated a suicide plan. In so holding, the court specifically stated that because this information was never transmitted to the staff psychiatrist, "any opportunity to form a medical judgment was foreclosed." *Id.* Here, by contrast, it is the medical judgments of the Doctor Defendants as to her care and treatment which she is challenging.

For these reasons, the Doctor Defendants' and the NYCHHC's motion to dismiss Plaintiff's negligence claim as set forth in her eighth cause of action is granted, as is their motion to dismiss Plaintiff's tenth cause of action.[9]

### VII.    Plaintiff's Ninth Cause of Action is Dismissed Against the Doctor Defendants and the NYCHHC.

Plaintiff's ninth cause of action asserts a claim for negligent staffing, hiring, training, and supervision. *See* SAC at 33. Plaintiff alleges that the NYCHHC was negligent for failing to "properly and sufficiently" staff its psychiatric emergency room, and for "negligently select[ing], hir[ing], train[ing], retain[ing], assign[ing], and supervis[ing] its staff." *Id.* ¶¶ 202, 205; *see id.* ¶¶ 203–07. Defendants argue that Plaintiff's ninth cause of action fails as against the NYCHHC because claims for negligent hiring, training, and supervision cannot be brought where the employees being hired, trained, and supervised act within the scope of their employment, as the Doctor Defendants had done.

As Defendants correctly point out, "[g]enerally, where an employee is acting within the scope of his or her employment, the employer is liable for the employee's negligence under a theory of respondeat superior and no claim may proceed against the employer for negligent hiring, retention, supervision or training." *Talavera v. Arbit*, 795 N.Y.S.2d 708, 709 (N.Y. App. Div. 2005); *see also Richardson v. City of New York*, No. 15-cv-543, 2015 WL 7752143, at *18

---

[9] The medical malpractice claim—which is not at issue in this motion—survives.

(S.D.N.Y. Nov. 18, 2015) (collecting cases), *report and recommendation adopted*, No. 15-cv-0543, 2016 WL 1637997 (S.D.N.Y. Apr. 22, 2016). "This is because if the employee was not negligent, there is no basis for imposing liability on the employer, and if the employee was negligent, the employer must pay the judgment regardless of the reasonableness of the hiring or retention or the adequacy of the training." *Karoon v. N.Y.C. Transit Auth.*, 659 N.Y.S.2d 27, 29 (N.Y. App. Div. 1997). "[T]he doctrine of respondeat superior applies to intentional and unintentional torts that fall within the scope of employment." *Rowley v. City of New York*, No. 00-cv-1793, 2005 WL 2429514, at *12 (S.D.N.Y. Sept. 30, 2005).[10]

Plaintiff does not contend that the Doctor Defendants acted outside the scope of their employment, and nothing in the Complaint gives rise to the inference that they did so. To the contrary, Plaintiff alleges that the NYCHHC is "liable for the wrongful actions of the individual defendants under the common law of New York State based on the theory of respondeat superior liability because [its] employees or agents were acting within the scope of their employment and under [its] control at the times relevant to this Complaint." SAC ¶ 130.

Plaintiff urges the Court not to dismiss the ninth cause of action at this stage because it is an alternative theory of liability. The Court disagrees, as this is not an issue of inconsistent claims. *See Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 521–22 (S.D.N.Y. 2015), *on reconsideration in part on other grounds*, 133 F. Supp. 3d 563 (S.D.N.Y. 2015). Instead, where employees acted within the scope of their employment, "an employer may not be held liable for negligent hiring, training, and retention as a matter of law." *Id.* at 522; *see also Colodney v. Continuum Health Partners, Inc.*, No. 03-cv-7276, 2004 WL 829158, at *8 (S.D.N.Y. Apr. 15,

---

[10] "Although a municipality cannot be held vicariously liable on a section 1983 claim, under New York state law, a municipality may be held vicariously liable on state law claims asserted against individual officers under a theory of *respondeat superior*." *Martinez v. N.Y. Police Dep't*, No. 19-cv-9885, 2021 WL 4206944, at *2 (S.D.N.Y. Aug. 9, 2021).

2004) (granting the defendants' motion to dismiss a plaintiff's claim for negligent supervision and recruitment on the ground that he failed to assert facts that could support an inference that the defendants acted outside the scope of their employment); *Murns v. City of New York*, No. 00-cv-9590, 2001 WL 515201, at *5 (S.D.N.Y. May 15, 2001) (dismissing a plaintiff's claim for negligent hiring and supervision where he also sought to hold an employer liable for medical malpractice by its employees on the ground that the employer would be liable for that claim under a theory of respondeat superior).

Accordingly, the Court grants the NYCHHC's motion to dismiss Plaintiff's ninth cause of action against it. To the extent Plaintiff sought to bring claims for negligent staffing, hiring, training, and supervision against the Doctor Defendants, the Court grants the Doctor Defendants' motion to dismiss such claims as well, on the ground that Plaintiff failed to plausibly plead facts supporting them.

### VIII. Plaintiff's Eleventh Cause of Action is Dismissed Against the Doctor Defendants.

Lastly, Plaintiff's eleventh cause of action is for "common law negligence." SAC at 34; *see id.* ¶¶ 210–11. This claim is based on the NYCHHC's "failure to properly record statements for [Plaintiff's] sister." *Id.* ¶ 211. The NYCHHC does not move to dismiss this cause of action. It is unclear whether Plaintiff sought to bring this claim against the Doctor Defendants. To the extent she did, the Court grants the Doctor Defendants' motion to dismiss the eleventh cause of action against it for failure to state a claim, as Plaintiff asserts no facts as to the Doctor Defendants' conduct in this regard. *Compare* SAC at 34, ¶ 209 (asserting her tenth cause of action for negligence against "All Defendants"), *with id.* at 34–35, ¶ 211 (failing to specify which defendants

were the subject of her eleventh cause of action and asserting only that "Defendant NYCHHC acted negligently").

### IX.    Leave to Amend

"Ordinarily a plaintiff should be granted leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint." *Obra Pia Ltd. v. Seagrape Invs. LLC*, No. 19-cv-7840, 2021 WL 1978545, at *3 (S.D.N.Y. May 18, 2021). Under Federal Rule of Civil Procedure 15(a), "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Although the Second Circuit has held that it is not "an abuse of the district court's discretion" to decline to grant leave to amend where it "has not been sought," *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1132 (2d Cir. 1994), a district court may sua sponte grant the plaintiff leave, *see, e.g., JoySuds, LLC v. N.V. Labs, Inc.*, 668 F. Supp. 3d 240, 262 (S.D.N.Y. 2023). "When deciding whether to sua sponte grant leave to amend, courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility." *Id.* The Court will permit Plaintiff one opportunity to further amend the Complaint, but emphasizes that she shall only do so if she, in good faith, "is able to remedy the pleading deficiencies addressed herein." *Id.* at 264. If Plaintiff decides to file an additional amended complaint, she is directed to state with specificity which Defendants are the subject of each cause of action.

**CONCLUSION**

For the foregoing reasons, the two partial motions to dismiss are granted in their entirety.

In sum, the following claims are dismissed as to the following Defendants:

- All claims against Defendant Poulakos;

- Count One against the Doctor Defendants and the NYCHHC;

- Count Two against the NYCHHC;

- Count Three against the NYCHHC;

- Count Six against the Doctor Defendants and the NYCHHC;

- Count Seven against the Doctor Defendants and the NYCHHC;

- Count Eight's negligence claim against the Doctor Defendants and the NYCHHC;

- Count Nine against the Doctor Defendants and the NYCHHC;

- Count Ten against the Doctor Defendants and the NYCHHC; and

- Count Eleven against the Doctor Defendants.

The Clerk of Court is respectfully directed to close the motions pending at ECF Nos. 179 and 182.

SO ORDERED.

Dated:    September 30, 2024
          New York, New York

_____
Ronnie Abrams
United States District Judge